## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jane Roe, | : | Civil Action |
| | : | |
| Plaintiff | : | No. |
| | : | |
| vs. | : | |
| | : | |
| The Pennsylvania State University, The | : | |
| Pennsylvania State University Board of | : | |
| Trustees, and John Doe | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

Plaintiff Jane Roe ("Plaintiff"), by her undersigned counsel, brings this civil action pursuant to the law cited herein against Defendants The Pennsylvania State University ("Penn State"), The Pennsylvania State University Board of Trustees ("Penn State Board of Trustees"), and John Doe ("Doe") (collectively, "Defendants").[1]

## INTRODUCTION

1.    This is an action arising under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Pennsylvania Human Relations Act ("PHRA"); Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a); Section 1983 of the Civil Rights Act of 1871 ("Section 1983"), 42 U.S.C. § 1983; the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d); and Pennsylvania common law.

## JURISDICTION AND VENUE

2.    This Court has original jurisdiction to hear this action and adjudicate the claims herein pursuant to 28 U.S.C. §§ 1331, 1343.

---

[1] "Jane Roe" is a pseudonym. Plaintiff will be filing a Motion for Permission to Proceed Under a Pseudonym.

3.      Pursuant to 28 U.S.C. § 1367, the supplemental jurisdiction of this Court is invoked with regard to Plaintiff's PHRA and state common law claims.

4.      All jurisdictional prerequisites to bringing this action have been satisfied because:

(a)     Plaintiff dual-filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"); and

(b)     On February 15, 2018, the EEOC issued the Right to Sue Notice.

5.      Venue is appropriate in the Eastern District of Pennsylvania because Penn State resides within this judicial district and/or Penn State may be served with process therein. *See* 28 U.S.C. §§ 1391(b)(1) and (d).

6.      Specifically, Penn State operates twenty-four (24) campuses throughout Pennsylvania, including five (5) campuses that are located within the Eastern District of Pennsylvania. *See* http://www.psu.edu/feature/2012/12/11/locations-throughout-pennsylvania (accessed May 21, 2018).

## **THE PARTIES**

7.      Plaintiff is an adult female and is a citizen and resident of the United States. Plaintiff resides in Philadelphia, Pennsylvania.

8.      At all relevant times, Plaintiff was a student at Penn State.

9.      At all relevant times, Plaintiff was also employed with Penn State's University Police department.

10.     Penn State is a domestic non-profit corporation with its headquarters located at 208 Old Main University Park, PA 16802.

11.     Penn State employs over seventeen thousand (17,000) employees.

12.     Penn State is an employer within the meaning of Title VII, the PHRA, and the EPA.

13.     Penn State is a public university receiving federal funds and thus, subject to Title IX.

14.     The Penn State Board of Trustees "is the corporate body established by the charter with complete responsibility for the government and welfare of the University and all the interests pertaining thereto including students, faculty, staff and alumni." http://www.trustees.psu.edu/ (accessed May 21, 2018).

15.     At all relevant times, Penn State and the Penn State Board of Trustees acted by and through its agents and/or employees.

16.     John Doe ("Doe") is an adult male individual and is a citizen and resident of the United States. Upon information and belief, Doe last resided in State College, Pennsylvania.

17.     At all relevant times, Doe was a student at Penn State.

18.     At all relevant times, Doe was also employed with Penn State's University Police.

## BACKGROUND

### Penn State Policy AD-85

19.     Penn State maintains a policy entitled "AD85 Sexual And/or Gender-Based Harassment and Misconduct (Including Sexual Harassment, Sexual Assault, Dating Violence, Domestic Violence, Stalking, and Related Inappropriate Conduct) (Formerly Discrimination, Harassment...)" ("Policy AD-85"), which was published on January 27, 2014. *See* https://policy.psu.edu/policies/ad85 (accessed May 21, 2018).

20.     Pursuant to Policy AD-85 states, Penn State committed to providing "regular, mandatory training for all University employees related to issues covered under this Policy." *See id.*

21.    Policy AD-85 defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwanted, inappropriate, or unconsented to." *See id.*

22.     Policy AD-85 prohibits sexual harassment that "is sufficiently severe or pervasive so as to substantially interfere with the harassed individual's employment, education or access to University programs, activities and opportunities, or creates a hostile or offensive environment for that individual or others." *See id.*

23.    Policy AD-85 defines sexual misconduct as "a form of sexual harassment and refers to sexual offenses including but not limited to rape, sexual assault, sexual battery, sexual exploitation, sexual coercion and any other forms of nonconsensual sexual activity." *See id.*

24.    Policy AD-85 states, "[s]exual assault occurs when a person engages in sexual intercourse or deviate sexual intercourse with a complainant without the victim's consent, and includes rape, fondling, incest, or statutory rape." *See id.*

25.    Policy AD-85 states, "[c]onsent must be informed, freely given and mutual . . . If a person is mentally or physically incapacitated or impaired so that such person cannot understand the fact, nature or extent of the sexual situation, there is no consent. This includes impairment or incapacitation due to alcohol or drug consumption, or being asleep or unconscious, where the respondent knew or reasonably should have known that the person was incapacitated. Inducement of incapacitation of another with the intent to affect the ability of an individual to consent or refuse to consent to sexual contact almost always, if not always, negates consent." *See id.*

26.    Policy AD-85 states, "[s]talking is a course of conduct directed at a specific person that would cause a reasonable person to fear for his/her safety or the safety of others, or to suffer substantial emotional distress. Stalking may include repeatedly following, harassing, threatening,

or intimidating another by telephone, mail, electronic communication, social media, or any other action, device or method." *See id.*

27. Policy AD-85 also prohibits retaliation. *See id.*

28. All Responsible Employees are required to report violations of Policy AD-85. *See id.*

29. According to Policy AD-85, Penn State will discipline students who violate Policy AD-85 in accordance with the Code of Conduct & Student Conduct Procedures Manual. *See id.*

30. According to Policy AD-85, Penn State will also discipline employees who violate Policy AD-85. *See id.*

### Penn State's Code of Conduct & Student Conduct Procedures Manual

31. Penn State also maintains a Code of Conduct & Student Conduct Procedures Manual (the "Code of Conduct"). *See* https://studentaffairs.psu.edu/support-safety-conduct/student-conduct/code-conduct (accessed May 21, 2018).

32. The Code of Conduct prohibits off campus conduct that affects a "Substantial University Interest," which is behavior that:

(a) Violates local, state, or federal law;

(b) Indicates that the student "may present a danger or threat of the health or safety of them or others;" or

(c) Is detrimental to the educational interests of the University.

*See id.*

33. The Code of Conduct defines sexual harassment as:

Engaging in unwelcome conduct of a sexual nature that is sufficiently severe or pervasive so as to substantially interfere with the individual's employment, education, or access to University programs, activities, and opportunities, and such conduct would detrimentally affect a reasonable person under the same circumstances. Sexual harassment may include, but

5

is not limited to, sexual advances, requests for sexual favors, sexual exploitation, stalking, dating violence, and domestic violence (as describes in policy AD-85).

Sexual misconduct is a form of sexual harassment and refers to attempted or completed unwanted or non-consensual sexual activity, including, but not limited to the following . . . sexual assault, sexual battery . . . intercourse without consent . . .

*See id.*

34.     The Code of Conduct defines harassment as "[e]ngaging in behavior that is sufficiently severe or pervasive so as to threaten as individual or substantially interfere with the individual's employment, education or access to University programs, activities or opportunities, and such behavior would detrimentally affect a reasonable person under the same circumstances." *See id.*

35.     Stalking is harassment under the Code of Conduct. *See id.*

36.     The Code of Conduct also contains "Special Protocols for Title IX Allegations," which describes Penn State's Title IX investigation and hearing procedure (the "Title IX Protocols").

37.     A true and correct of Penn State's Title IX Protocol is attached hereto and incorporated herein as **Exhibit "A"**. According to Penn State's Title IX Protocols, once a conduct process is initiated, these steps "will" occur. *See id.*

### FACTS RELEVANT TO PLAINTIFF'S TITLE VII AND PHRA CLAIMS AND BREACH OF CONTRACT CLAIM

### Plaintiff Enrolls at Penn State; Begins Working for University Police

38.     In August 2012, Plaintiff enrolled as an undergraduate student at Penn State.

39.     In August 2013, Plaintiff began working for Penn State's University Police as Student Auxiliary Officer.

40.     "Student Auxiliary Officers are comprised of approximately 160 uniformed student employees who provide various services to the Penn State community. Student Auxiliary Officers are deployed to provide security and traffic for mostly all events, including but not limited to: ICA sporting events, Rec Hall details, HUB Late Night and HUB socials, Bryce Jordan Center events, Arrival Days, and Ag Progress. Additionally, Auxiliary Officers patrol in the residence hall areas throughout campus to ensure our student housing is secure." https://police.psu.edu/student-auxiliary-officers (accessed May 21, 2018).

41.     At all relevant times, Lt. Grimm supervised all Auxiliary Officers within University Police. Lt. Grimm's job duties included firing and recommending promotions for Auxiliary Officers.

42.     At all relevant times, Lieutenant Diane Grimm ("Lt. Grimm") was Plaintiff's direct supervisor and acted as an agent of and on behalf of Penn State.

### Summer/Fall 2014 − Plaintiff First Reports a Hostile Work Environment

43.     Starting in May 2014, Samir Glen-Roundtree ("Officer Glen-Roundtree"), another Auxiliary Officer, began making inappropriate sexual jokes and comments in front of Plaintiff in the workplace, including but not limited to the following:

(a)     Officer Glen-Roundtree made a comment to Plaintiff in the general office area that he "thought about her a lot at night" when he was asleep.

(b)     In June 2014, Officer Glen-Roundtree informed Plaintiff that he had a "sex dream" about her.

(c)     Officer Glen-Roundtree also offered Plaintiff massages, claimed that Plaintiff "seemed tense," and tried to massage Plaintiff's shoulders.

44. Plaintiff informed supervisors Lieutenant Joseph Persico ("Lt. Persico") and Sergeant Wesley Ernie ("Sgt. Ernie") and Auxiliary Officer Tom Queppet ("Officer Queppet") of Officer Glen-Roundtree's comments.

45. Lt. Persico reported Officer Glen-Roundtree's behavior and comments to Lt. Grimm.

46. Plaintiff also reported Officer Glen-Roundtree's behavior and comments to Lt. Grimm.

47. Lt. Grimm informed Plaintiff that Lieutenant Stephanie Brooks ("Lt. Brooks") would investigate Plaintiff's complaint and that Officer Glen-Roundtree would be removed from University Police.

48. Lt. Grimm told Plaintiff that Plaintiff would be interviewed further, that Officer Glen-Roundtree would be interviewed, and that they would not be scheduled to work together while the investigation was pending.

49. Much to Plaintiff's dismay, instead of taking steps to protect Plaintiff from Officer Glen-Roundtree during the investigation, Lt. Grimm scheduled Officer Glen-Roundtree and Plaintiff to work alone together a mere one week following Plaintiff's complaint. This made Plaintiff extremely uncomfortable.

50. When Plaintiff asked Lt. Grimm about the status of the investigation against Officer Glen-Roundtree and complained about the scheduling issues, Lt. Grimm told Plaintiff that Penn State decided to terminate the investigation without taking any further steps or making any final decision on Plaintiff's complaint.

51. Lt. Grimm also told Plaintiff that she was "expected to be a professional and handle this accordingly." Plaintiff interpreted Lt. Grimm's statement to mean that Plaintiff was being instructed by her supervisor (Lt. Grimm) to drop the issue.

52.     Plaintiff was disappointed and unnerved, but made the decision to do as her supervisor (Lt. Grimm) instructed in hopes of protecting Plaintiff's career in law enforcement.

### Following Plaintiff's Complaints, Penn State's University Police Retaliates Against Plaintiff

53.     Rather than taking steps to protect Plaintiff and address her complaints, officials in University Police began to retaliate against Plaintiff for her complaints of sexual harassment.

54.     On June 13, 2014, Plaintiff applied for a promotion from Auxiliary Officer to Assistant Supervisor in Hiring, which included a wage increase.

55.     Plaintiff was qualified for the Assistant Supervisor in Hiring position because of her work experience, which included approximately one year of employment with the University Police.

56.     Lt. Grimm told Plaintiff that her promotion would be denied because Plaintiff was "causing drama" within University Police.

57.     Plaintiff asked Lt. Grimm how she was "causing drama" and what Plaintiff could do to address Lt. Grimm's concerns. Lt. Grimm stated that Plaintiff needed to "figure it out."

58.     During this time, Lt. Grimm also emailed all Auxiliary Officers, stating that they needed to "stop the drama" around the office.

59.     When Plaintiff asked Lt. Grimm what these emails were referring to, Lt. Grimm advised Plaintiff that these emails were specifically in reference to Plaintiff.

60.     The only "drama" that Plaintiff had been involved in at work was reporting sexual harassment.

61.     Plaintiff understood Lt. Grimm's email and the subsequent statements to her to be a reprimand issued in direct retaliation for Plaintiff's complaints about sexual harassment in the workplace.

62.     In August 2014, about six weeks after Plaintiff complained about Officer Glen-Roundtree, Officer Glen-Roundtree left University Police of his own volition.

63.     To Plaintiff's knowledge, Penn State never opened a Title IX investigation or otherwise investigated Plaintiff's complaint nor did Penn State reprimand or sanction Officer Glen-Roundtree for his sexually harassing behavior.

64.     Furthermore, Penn State never advised Plaintiff of the outcome of her complaint against Officer Glynn-Roundtree nor did Penn State offer Plaintiff any measures designed to protect her from continued sexual harassment in the workplace by Officer Glen-Roundtree prior to his departure.

65.     While Plaintiff was uncomfortable with the way that Penn State and University Police handled Plaintiff's complaints, Plaintiff remained interested in pursuing a career in law enforcement after graduating from Penn State.

66.     Given Plaintiff's strong desire to build her career in law enforcement, Plaintiff continued to seek advancement within University Police, notwithstanding the fact that Plaintiff had been explicitly advised that her report of sexual harassment had undermined her chances for promotion.

67.     On August 20, 2014, Plaintiff again applied for a promotion to a position as an Assistant Supervisor in Hiring.

68.     Plaintiff was qualified for the Assistant Supervisor in Hiring position because of her work experience, which included approximately one year of employment with the University Police.

69.     Lt. Grimm informed Plaintiff that she would be promoted because Plaintiff had "fixed her problems" from the last time Plaintiff sought a promotion, a mere two months earlier.

70.     Plaintiff performed well in the Assistant Supervisor in Hiring position.

71.     In October 2014, Plaintiff applied for another promotion to Sergeant, which had a wage increase.

72.     Plaintiff was qualified for the Sergeant position based on her experience and record within the department.

73.     Plaintiff expected to receive this promotion; however, University Police denied Plaintiff the promotion.

74.     Notably, a male officer with far less experience than Plaintiff, Robert Inglima, faced no barriers to promotion and was promoted easily to Corporal in far less time than it took for Plaintiff to obtain that rank.

75.     In or around January 2015, Lt. Grimm notified University Police employees that the process for promotions would change. Previously, all supervisors and co-workers could submit recommendations regarding an employee's request for a promotion, which would become a part of the employee's personnel file. Lt. Grimm, however, changed the procedure so that she would now personally select the supervisors and co-workers allowed to submit recommendations for employees seeking promotion.

76.     In January 2015, Plaintiff applied for another promotion to both a Lieutenant and a Sergeant position, which would have included a wage increase.

77.     Plaintiff was qualified for the Lieutenant and Sergeant positions based on her experience and record within the department.

78.     Additionally, Lt. Amelia Houtz recommended Plaintiff for the promotion to Lieutenant.

79.     Notwithstanding Plaintiff's excellent qualifications and track record as an employee, University Police again passed Plaintiff over for promotion for the fourth time since Plaintiff made her initial sexual harassment complaint.

80.     Upon information and belief, Lt. Grimm made the decision to deny Plaintiff's promotion.

81.     Instead of promoting Plaintiff, University Police promoted Corporal Inglima, who Plaintiff had trained and supervised, above Plaintiff to Sergeant.

82.     When Plaintiff inquired about being passed over for promotion yet again, notwithstanding her qualifications, Lt. Grimm informed Plaintiff that she was still "causing drama" in the office and, for that reason, was not prepared to be promoted.

83.     Additionally, Lt. Grimm informed Plaintiff that her evaluations from her supervisors had been "lost" and, as a result, Plaintiff had been denied the promotion.

84.     Plaintiff asked Lt. Houtz about her evaluations and Lt. Houtz agreed to re-submit copies of all of Plaintiff's evaluations and recommendations to Lt. Grimm for review.

85.     Lt. Grimm, however, merely said she would Plaintiff's evaluations in her file, but did not revisit the issue of promoting Plaintiff.

86.     Lt. Grimm also denied Plaintiff's request to review her personnel file and evaluations.

### Spring 2015 − Hostile Work Environment

87.     In or around April 2014, Letra Renninger ("Officer Renninger") began working for University Police as an Auxiliary Officer.

88.     Plaintiff and Officer Renninger became friends.

89.     Upon information and belief, in May 2014, Officer Renninger took a leave of absence from Penn State and University Police due to mental health issues.

90.     In January 2015, Officer Renninger re-enrolled as a student at Penn State.

91.     Lt. Grimm allowed Officer Renninger to resume her work at University Police as an Auxiliary Officer.

92.     At all relevant times, University Police was aware of Officer Renninger's mental health issues.

93.     Although Plaintiff was wary of Officer Renninger due to her history of psychological instability, Plaintiff did not want to add to Officer Renninger's considerable distress by ignoring Officer Renninger's attempts to resume their friendship. Therefore, Plaintiff maintained casual contact with Officer Renninger.

94.     Plaintiff received and responded to occasional text messages from Officer Renninger and also saw Officer Renninger at work, on campus, and when visiting mutual friends.

95.     Officer Renninger developed a romantic interest in Plaintiff that Plaintiff did not reciprocate.

96.     Officer Renninger's contact with Plaintiff became increasingly inappropriate. For example:

        (a)     Officer Renninger attempted to kiss Plaintiff at an off-campus party and Plaintiff had to push her off.

        (b)     Officer Renninger repeatedly asked Plaintiff to be her girlfriend and began coming to Plaintiff's apartment unannounced.

        (c)     Officer Renninger also started texting Plaintiff inappropriately.

97.     Plaintiff met with Officer Renninger and told her that she wanted to remain friends, but advised Officer Renninger that she was becoming too "clingy" as a friend and explained that her behavior was starting to become "weird." Officer Renninger ignored Plaintiff's request and continued seeking contact with Plaintiff.

98.     On February 2, 2015, Officer Renninger contacted Plaintiff's roommate and Lt. Persico, who was Plaintiff's boyfriend, to inform them that she was in the parking lot of Plaintiff's apartment building and was having an asthma attack.

99.     Knowing that Officer Renninger had quite severe and potentially life threatening asthma, and fearing for Officer Renninger's well-being, Plaintiff, Lt. Persico, and Plaintiff's roommate ran downstairs to check on Officer Renninger and called 911 for her.

100.    Plaintiff, Lt. Persico, and Plaintiff's roommate followed Officer Renninger's ambulance to Mount Nittany Medical Center.

101.    After arriving at Mount Nittany Medical Center, Plaintiff went into Officer Renninger's hospital room to see if she had recovered and if she was ok.

102.    At this point, Officer Renninger confessed that she was in love with Plaintiff.

103.    Plaintiff tried to be compassionate, but informed Officer Renninger that she did not have any romantic feelings for her.

104.    Officer Renninger then stated to Plaintiff, "if this continues, I'm going to turn on you, because I want what I want."

105.    Since 911 was called, Patton Township Police appeared at the hospital to obtain a report. Plaintiff informed the police officer about what had happened and was quoted as a witness in the report. Later, Patton Township Police called Lt. Grimm to inform her of what had occurred.

### February 3, 2015 − Plaintiff Reports Officer Renninger's Sexual Harassment To Penn State Administrators; Penn State's University Police Again Retaliates Against Plaintiff

106.    After Officer Renninger's asthma-attack incident, Plaintiff was very concerned that Officer Renninger's behavior would escalate.

107.    Accordingly, on February 3, 2015, Plaintiff reported Officer Renninger's conduct to Mary Lou Stoner, an administrative assistant in the University Police office.

108.    Ms. Stoner recommended that Plaintiff meet with David Gray, Senior Vice President of Finance and Business, to see if he could help.

109.    Plaintiff went to Mr. Gray's office and had an in-person meeting with him.

110.    During this meeting, Plaintiff reported what was occurring at work and how Plaintiff felt unsafe working with Officer Renninger.

111.    Plaintiff also explained that Plaintiff was concerned that Lt. Grimm would not help Plaintiff because she had not previously helped Plaintiff after Plaintiff reported a hostile work environment.

112.    Mr. Gray instructed Plaintiff to meet with Lt. Grimm and stated that he wanted to "wait to see what [Lt. Grimm] would do" before he recommended a course of action.

113.    Mr. Gray also recommended that Plaintiff meet with Peggy Lorah, Director of the Center for Women Students, in order to receive support and resources.

114.    Plaintiff went immediately to Ms. Lorah's office. Ms. Lorah recommended that Plaintiff file a Title IX complaint against Officer Renninger, but based on Mr. Gray's advice, Plaintiff waited until she had a chance to meet with Lt. Grimm to see if Lt. Grimm would mitigate the situation.

115.    Later that day, Lt. Grimm called Plaintiff into her office to discuss the asthma-attack incident regarding Officer Renninger. Plaintiff informed Lt. Grimm that Plaintiff felt uncomfortable working with Officer Renninger.

116.    Plaintiff also showed Lt. Grimm the text messages Officer Renninger had sent to Plaintiff, which clearly indicated that Officer Renninger was harassing Plaintiff.

117.    Plaintiff requested that she not have further contact with Ms. Renninger at work.

118.    Lt. Grimm was not surprised to hear about the stalking and harassing behavior from Officer Renninger, but acted as if it was not a serious concern.

119.    Lt. Grimm informed Plaintiff that she would need to speak with Human Resources about the issue and give Plaintiff an answer later about her request to have Ms. Renninger kept away from Plaintiff in the workplace.

120.    Shortly after Officer Renninger recovered from her asthma attack, Officer Renninger followed through on her threat to Plaintiff and became increasingly hostile toward Plaintiff, including but not limited to:

(a)    Officer Renninger began attacking Plaintiff through text message for "lying" about saving her life to their friends.

(b)    Officer Renninger repeatedly complained to Plaintiff that Plaintiff was not spending enough time with her.

(c)    Officer Renninger had access to Plaintiff's work schedule and class schedule, and began stalking Plaintiff more frequently.

121.    When Officer Renninger came up with excuses to see Plaintiff on a daily basis, Plaintiff realized that Officer Renninger was following and stalking Plaintiff and became increasingly concerned for her own safety.

122.    Aware of Officer Renninger's mental health history, Plaintiff began taking extreme steps to avoid contact with Officer Renninger, including staying overnight at other friends' apartments. Plaintiff also asked her boyfriend to drive her around town when she needed to travel, instead of taking the bus, because Officer Renninger knew Plaintiff's class schedule and would appear at these times.

123.    In order to prevent Officer Renninger from being able to stalk Plaintiff around her schedule at work, Plaintiff asked Lt. Houtz to change Plaintiff's work hours at the last minute,

so that her hours were not posted for Officer Renninger to see. Plaintiff tried to change her work hours to two hours before or after she was initially scheduled to work.

124.    While Lt. Houtz tried her best to accommodate Plaintiff's request, Plaintiff received write-ups and reprimands for missing work, coming in late, or calling in sick to avoid Officer Renninger, even though many of these write-ups were due to the last minute confusion in Plaintiff's schedule created by trying to avoid Officer Renninger.

125.    Lt. Houtz advocated for Plaintiff to Lt. Grimm to prevent write-ups from being placed in Plaintiff's record, but Lt. Grimm stated, "it didn't matter, [Plaintiff] had to come to work."

126.    During Plaintiff's career at University Police, Plaintiff did not receive any write-ups except for the write-ups she received due to trying to Officer Renninger stalking and harassment of Plaintiff. These write-ups negatively impacted Plaintiff's work history.

### February 15, 2015 – Berkey Creamery Stalking Incident

127.    On February 15, 2015, Plaintiff was walking near the Berkey Creamery on campus when Plaintiff realized that Officer Renninger was following her.

128.    Officer Renninger approached Plaintiff with hostility and told Plaintiff that she was very upset that Plaintiff had reported her to Lt. Grimm. Officer Renninger told Plaintiff that Lt. Grimm had told her about Plaintiff's complaint, and cited to specific inappropriate text messages she sent me.

129.    Officer Renninger's agitated state alarmed Plaintiff. Plaintiff twice told Officer Renninger that Plaintiff did not want Officer Renninger near her. Officer Renninger continued to try to talk to Plaintiff, but eventually left.

130.    Plaintiff was upset because she expected that Lt. Grimm would keep Plaintiff's complaints confidential and that Lt. Grimm would allow the investigation into her complaints to unfold in a professional manner.

131.    Instead, Lt. Grimm told Officer Renninger the details of Plaintiff's complaint without warning Plaintiff.

132.    Plaintiff quickly realized that Lt. Grimm had no intention of handling Plaintiff's complaint properly and no longer felt safe making reports to Lt. Grimm.

133.    Plaintiff reported the exchange Plaintiff had with Officer Renninger to Lt. Houtz, who later advised Plaintiff that the incident would be reported to Lt. Grimm, according to protocol.

134.    Also on February 15, 2015, Plaintiff noted another promotional opportunity at University Police. Plaintiff again applied for the positions of Lieutenant and Sergeant, which included a wage increase.

135.    Plaintiff was qualified for the Lieutenant and Sergeant positions based on her experience and record within the department.

### February 16, 2015 − Penn State's University Police Continues to Retaliate Against Plaintiff; Plaintiff's First Meeting With Danny Shaha

136.    The next day, on February 16, 2015, Lt. Grimm called Plaintiff into her office and informed Plaintiff that, based on her "investigation," there was "no evidence" to support Plaintiff's assertions that Plaintiff felt unsafe working with Officer Renninger.

137.    Lt. Grimm also informed Plaintiff that if she continued to complain about Officer Renninger, Plaintiff would be fired from University Police.

138.    Plaintiff expressed to Lt. Grimm that there was plenty of documentation of the harassment and specifically mentioned the Berkey Creamery incident that had happened the day before.

139.    Plaintiff also asked Lt. Grimm to review the security camera footage. Lt. Grimm said she had reviewed the security camera footage and did not see any issues.

140.    Plaintiff reiterated to Lt. Grimm that she did not feel safe at work with Officer Renninger around.

141.    Lt. Grimm told Plaintiff to "file a police report" if Plaintiff did not feel safe, instead of filing a Title IX complaint.

142.    Finally, Lt. Grimm stated that she had received Plaintiff's application for a promotion and advised Plaintiff that due to the incidents with Officer Renninger, Plaintiff would not be considered for any future promotions and would be "blacklisted."

143.    Plaintiff began to cry and Lt. Grimm said, "[y]ou can leave now."

144.    After the February 6, 2015 meeting with Lt. Grimm, Plaintiff went to Ms. Lorah's office and told Ms. Lorah what happened.

145.    Ms. Lorah recommended that Plaintiff meet with Danny Shaha, Senior Director of the Office of Student Conduct, who was responsible for processing Title IX complaints.

146.    Ms. Lorah accompanied Plaintiff upstairs to Mr. Shaha's office where Plaintiff recounted the situation and explained the stalking and harassment she was experiencing from Officer Renninger, as well as the retaliation she was receiving from Lt. Grimm.

147.    Mr. Shaha told Plaintiff "not to worry" and that "it would be taken care of."

148.    Mr. Shaha also advised Plaintiff that Officer Renninger would be removed from University Police and that he would call Lt. Grimm that day to ensure that Officer Renninger

and Plaintiff would not be scheduled during the same shift during THON, which was an upcoming event.

149.    After Plaintiff explained to Mr. Shaha the history of Lt. Grimm discouraging Plaintiff's complaints and retaliating against Plaintiff for making previous sexual harassment complaints, Mr. Shaha told Plaintiff that Lt. Grimm would be removed from work pending the outcome of the investigation and assured Plaintiff that Plaintiff would not need to have contact with Lt. Grimm.

150.    After Plaintiff's meeting with Mr. Shaha, Plaintiff was hopeful that Penn State would finally address the ongoing sexual harassment and retaliation and that Plaintiff would feel safe again on campus and at work.

151.    Since Mr. Shaha stated he was going to talk to Lt. Grimm personally, Plaintiff also expected that Plaintiff would be free from any future workplace retaliation.

**February 17, 2015 – Plaintiff's Meeting with David Gray and Damon Sims**

152.    On February 17, 2015, Plaintiff was called to a meeting with Mr. Gray and Damon Sims, Vice President of Student Affairs, in Mr. Gray's office.

153.    For the fourth time, Plaintiff shared her concerns and issues regarding Lt. Grimm and Officer Renninger.

154.    Mr. Gray and Mr. Sims informed Plaintiff that there was an investigation pending against Lt. Grimm and involving University Police.

155.    While Mr. Gray and Mr. Sims conceded that it would be stressful, they told Plaintiff that she needed to "be patient" and assured Plaintiff the matter would finally be resolved.

156.    Mr. Gray and Mr. Sims also thanked Plaintiff for "cooperating."

157.    Finally, Mr. Gray told Plaintiff that if incidents continued to occur, Plaintiff should email him.

158.    After this meeting, Plaintiff again felt hopeful that her complaints would be resolved.

159.    In an email to Ms. Lorah, Mr. Sims memorialized the February 17, 2015 meeting and copied the following individuals: Mr. Shaha; Joseph Puzycki, Assistant Vice President of Student Affairs; Plaintiff; Dr. Kenneth Lehrman, Vice Provost of Affirmative Action; and Mr. Gray.

160.    In the email, Mr. Sims stated, "[Plaintiff] met earlier with David to share concerns about her interaction with two other students on the force, as well as the response I received from supervising staff when I lodged complaints. **Her complaints involve accusations of misconduct that would seem to violate Title IX.**"

161.    Mr. Sims further stated, "The matter necessarily **involves an employment issue too**, but I'd like the conversation to start with you, if possible. **David and I expressly promised that we could guard against any retaliation**. [Plaintiff] was quite direct in expressing concerns that retaliation has been an issue in past circumstances involving complaints by auxiliary police personnel."

### February 20, 2015 − THON Incidents

162.    On February 20, 2015, Lt. Grimm notified Plaintiff that she had spoken with Mr. Shaha and that Officer Renninger and Plaintiff would not be working the same detail later that night at THON.

163.    Lt. Grimm, however, also told Plaintiff that she was "not going to get involved in the issue between Plaintiff and Officer Renninger and that Plaintiff would need to "handle the situation on [her] own."

164.    Lt. Grimm reiterated from previous meetings that if she heard anything more about the issue, Plaintiff would be fired and would not receive any future promotions.

165.    Additionally, Lt. Grimm told Plaintiff that Plaintiff, not Officer Renninger, had to request permission from Lt. Grimm to get hours for work each week to ensure that Plaintiff and Officer Renninger did not encounter each other at work.

166.    After this meeting, Plaintiff had mixed feelings. While Plaintiff was glad that Officer Renninger was specifically instructed to stay away from Plaintiff, Plaintiff was upset because Plaintiff also had an additional constraint put on her since Plaintiff was the one who had to ask for permission to work each week.

167.    This restriction led to Plaintiff working fewer hours each week since Plaintiff did not have a set schedule. As a result, Plaintiff had a hard time paying her monthly bills.

168.    Although Plaintiff was hopeful that she would not encounter Officer Renninger at work based on Lt. Grimm's instructions, Plaintiff quickly learned this was not the case.

169.    While Lt. Grimm had not scheduled Plaintiff and Officer Renninger to work at the same time, Lt. Grimm scheduled them at adjacent schedules so that Plaintiff needed to relieve Officer Renninger from her duty, thereby requiring them to have contact.

170.    On February 20, 2015, while Plaintiff was working at the Bryce Jordan Center and talking with another co-worker, Officer Renninger walked in between Plaintiff and her co-worker, and made statements about "hot girls" being around.

171.    Plaintiff was extremely uncomfortable with Officer Renninger's statement and also the fact that Officer Renninger was boldly expressing that she had no intention of leaving Plaintiff alone.

172.    Later that night, Officer Renninger entered the work area and made sexually inappropriate comments in front of others, including commenting on "eating out girls" and

commenting on others' body parts, including stating that she liked "tits" and that another officer had "a fine ass."

173.   Lieutenants Houtz, Persico, and Terrance Kim observed Officer Renninger's behavior.

174.   Plaintiff reported Officer Renninger's stalking at the Bryce Jordan Center to Lt. Houtz and Lt. Persico, who in turn reported it to Lt. Grimm.

175.   Plaintiff expected that some action would be taken in response to her complaint and thought that because Officer Renninger clearly violated a direct order to stay away from Plaintiff, University Police would reprimand or dismiss Officer Renninger for her continued harassment of Plaintiff.

176.   University Police, however, did not issue any discipline to Officer Renninger and no one followed up with Plaintiff to discuss the incidents.

177.   After the incidents during THON weekend, Lieutenants Houtz, Persico, and Kim requested that Officer Renninger have her dorm access privileges removed because they had concerns about Officer Renninger's mental health and her ability to use her master key to access other students' dorm rooms.

178.   Although Officer Renninger was apparently called into Lt. Grimm's office and reprimanded regarding her language, this was the only reprimand Officer Renninger received.

179.   Moreover, instead of being rewarded for taking steps to protect students, Lt. Grimm reprimanded the officers who reported Officer Renninger.

180.   Lt. Grimm reprimanded Lt. Persico for complaining about Officer Renninger's actions and told him to "mind his own business."

181.   Lt. Grimm also reprimanded three Auxiliary Officers who reported Officer Renninger's comments and behavior and told them to "stop causing drama" and threatened

them with termination from their employment with University Police if they continued to raise concerns about Officer Renninger.

182.    At this point, it became clear to Plaintiff that Penn State did not intend to protect Plaintiff from Officer Renninger.

183.    Plaintiff became depressed, stressed, and anxious. Plaintiff was constantly on edge because she had to look over her shoulder to see if Officer Renninger was following her.

184.    Plaintiff also became overwhelmed by the numerous meetings she was having with Penn State administrators and at work with Lt. Grimm.

185.    Additionally, due to Plaintiff's career goals in law enforcement and the negative impact a mental health history could have on her career, Plaintiff did not feel that she could see a professional to receive counseling.

186.    Throughout the spring 2015 semester, Officer Renninger continued to come into the office during Plaintiff's work hours.

187.    Although Lt. Grimm was well aware of Officer Renninger's behavior, Lt. Grimm did nothing to intervene.

188.    Plaintiff simply tried her best to avoid Officer Renninger and remained extremely uncomfortable with her forced proximity to Officer Renninger.

### February 26, 2015 − Plaintiff Files a Written Title IX Complaint Against Officer Renninger

189.    On February 26, 2015, in response to Mr. Shaha's February 24, 2015 request, Plaintiff submitted a written complaint summarizing her issues with Officer Renninger and Lt. Grimm.

190.     Plaintiff's complaint detailed Officer Renninger's harassment and stalking of Plaintiff, Lt. Grimm's retaliation against Plaintiff for complaining about a hostile work environment, and the recent disturbing THON incident.

191.     On March 1, 2015, Mr. Shaha replied to Plaintiff and said that he would "be in touch soon."

192.     Plaintiff and Mr. Shaha arranged a meeting for March 25, 2015.

### March 17, 2015 − Plaintiff Reports Lt. Grimm's Retaliation

193.     On March 17, 2015, Plaintiff emailed Mr. Gray to update him on the situation Plaintiff was facing at work with Lt. Grimm and Officer Renninger.

194.     Specifically, Plaintiff stated that Lt. Grimm threatened to fire Plaintiff and refused to consider Plaintiff for promotions based on Plaintiff's complaints regarding Officer Renninger.

195.     Plaintiff also stated that due to Officer Renninger's presence and Lt. Grimm's inaction and retaliation, Plaintiff did not feel safe at work.

196.     Plaintiff also stated that she felt that she was facing retaliation for filing a Title IX complaint against Officer Renninger.

197.     Mr. Gray responded to Plaintiff's email by stating that he would see to it that her situation is appropriately addressed and would "be back in touch."

198.     The next day, Plaintiff received an email from Regis Becker, Penn State's Chief Ethics and Compliance Officer, requesting that Plaintiff attend a meeting with him and Robert Maney, Senior Director of Human Resources, to follow up with Plaintiff about her complaints to Mr. Gray. A meeting was scheduled for March 26, 2015.

199.     At this point, Plaintiff was dedicating significant time to pursuing numerous avenues of administrative complaints, none of which had resolved Plaintiff's overall safety concerns.

200.    This haphazard process, in which Plaintiff had to repeatedly tell the same story over and over to different Penn State officials, created significant distress for Plaintiff and interfered with Plaintiff's ability to carry out her educational objectives.

201.    Plaintiff also considered filing a criminal complaint against Officer Renninger, but elected not to because Plaintiff was already invested in addressing the problem through Penn State channels and because Plaintiff did not want to escalate the situation further for fear that Officer Renninger would become even more hostile and unstable, as she had in the past when Plaintiff made formal complaints.

**March 19, 2015 – Officer Renninger Files a PFA Against Plaintiff;
Lt. Grimm Continues to Retaliate Against Plaintiff**

202.    To Plaintiff's shock, on March 19, 2015, Officer Renninger filed a Protection From Abuse ("PFA") action against Plaintiff.

203.    In her PFA petition, Officer Renninger alleged that abuse took place on March 16, 2015, when Plaintiff "went to the office of student conduct and made a report claiming that she was stalking and harassing me."

204.    Based on other false allegations within the petition, a temporary PFA order was issued on an *ex parte* basis.

205.    Plaintiff was stunned to learn that Lt. Grimm had advised Officer Renninger to seek a protective order against Plaintiff even though Lt. Grimm was well aware that Plaintiff had made multiple complaints to numerous Penn State officials about Officer Renninger's harassment and stalking of Plaintiff.

206.    Upon information and belief, Lt. Grimm advised Officer Renninger to seek a protective order against Plaintiff because Lt. Grimm wanted Plaintiff to be fired from University Police.

207.    Due to the temporary PFA against Plaintiff, Plaintiff's work hours were further curtailed. Plaintiff was only allowed to work 4-5 hours per week, down from 15-20 hours per week, and had to seek special permission to work each week's hours so that Plaintiff did not work during times when Officer Renninger was present.

208.    Despite the fact that Plaintiff was the victim of Officer Renninger's harassment, a fact that was well documented within Penn State, Plaintiff was the one who was punished.

209.    The reduction in Plaintiff's work hours significantly affected Plaintiff's income throughout the semester, making it extremely difficult for Plaintiff to remain a student at Penn State.

210.    Plaintiff attempted to meet with Dr. Ken Lehrman, Vice Provost for Affirmative Action, to find out more information about what was happening with Plaintiff's Title IX complaint and to report the PFA and work issues.

211.    Dr. Lehrman was not in his office, so Plaintiff had a cursory meeting with Carmen Borges, Associate Director of Affirmative Action, in his place.

212.    Plaintiff detailed her issues and provided the names of two potential witnesses for Ms. Borges to interview, including Lt. Persico.

213.    Ms. Borges told Plaintiff that she would look into it and be in contact with Plaintiff in the future.

214.    After a class on Title IX taught by Dr. Lehrman, Plaintiff approached Dr. Lehrman and explained to him that she felt she was being retaliated against for her complaints.

215.    Dr. Lehrman told Plaintiff that he was "aware of [her] situation," based on his conversations with Mr. Shaha.

216.    Plaintiff reiterated that she needed to seek permission to work, which was negatively affecting her. Dr. Lehrman responded that this mandate was to "ease the stress for both [Officer Renninger and Plaintiff]" during this process.

217.    Plaintiff told Dr. Lehrman that Officer Renninger should also need to seek permission at work in order for the process to be fair. Dr. Lehrman told Plaintiff that he would "look into it."

218.    When Plaintiff asked when she could expect an answer, Dr. Lehrman said that Plaintiff should "just be patient." Plaintiff never heard from Dr. Lehrman again.

**<u>March 25, 2015 – Plaintiff's Second Meeting with Danny Shaha</u>**

219.    On March 25, 2015, Plaintiff met with Mr. Shaha and informed him of the PFA filing, explaining that Plaintiff believed it was unfair for Penn State to punish Plaintiff for filing her Title IX complaint and reiterated her request for Officer Renninger to be removed from the workplace.

220.    Mr. Shaha informed Plaintiff that the situation at work was "out of his hands" due to the PFA and because Officer Renninger had gone "through the legal system." Mr. Shaha informed Plaintiff that Plaintiff would have to resolve her issues through the PFA action, rather than through Penn State.

221.    Later that day, Plaintiff emailed Mr. Sims to provide him with a written summary of the retaliation Plaintiff faced from Lt. Grimm and the PFA that Officer Renninger filed against Plaintiff.

222.    Plaintiff did not receive a response from Mr. Sims or any acknowledgement of this complaint.

## **March 26, 2015 − Plaintiff's Meeting with Regis Becker**

223.    On March 26, 2015, Plaintiff had a two-hour meeting with Mr. Becker regarding Lt. Grimm's retaliation against Plaintiff.

224.    Despite being led to believe that Mr. Maney would be present throughout the meeting, after a half-hour, Mr. Maney left and another person took his place during this meeting. This continued throughout the meeting, where every half-hour, a new person would arrive and sit in the second chair in order to have a witness present during Mr. Becker's meeting with Plaintiff.

225.    Mr. Becker had a packet of prepared questions regarding University Police and Lt. Grimm; however, none of the questions were specific to Officer Renninger's harassment of Plaintiff or Lt. Grimm's retaliation against Plaintiff.

226.    Instead, the questions were very general. For example, "[d]o all police officers wear their uniforms at all times?" and "[d]oes dispatch appropriately respond to officers' calls?"

227.    When Plaintiff tried redirecting the answers to her specific complaints, Mr. Becker stated, "[t]hat's not why you're here, that's not what this is all about."

228.    Plaintiff left the meeting feeling frustrated, as it was another example of Penn State's failure to address Plaintiff's concerns.

229.    Upon information and belief, Mr. Becker had the same interview with Lt. Persico by telephone. When Lt. Persico mentioned the issues involving Officer Renninger and Lt. Grimm, Mr. Becker told Lt. Persico to keep his answers to the questions in the packet.

**April 7, 2015 – Temporary PFA Vacated;**
**Plaintiff's Reduced Work Hours Still In Effect**

230.    On April 7, 2015, the temporary PFA issued on March 19, 2015 was vacated.

231.    Also on April 7, 2015, Plaintiff provided a written account of her experiences to Mr. Becker via email to follow up on their March 26, 2015 meeting.

232.    In Plaintiff's email, she summarized Officer Renninger's harassment of her as well as Lt. Grimm's retaliation and inaction regarding Plaintiff's complaints.

233.    Plaintiff also included information about other instances of retaliation by Lt. Grimm against Plaintiff and other officers who made workplace-related complaints, identifying Lt. Grimm's longstanding pattern of retaliatory behavior.

234.    Later that day, Mr. Becker replied to Plaintiff's email and asked if he could share Plaintiff's account with Mr. Gray and Susan Basso, Vice President and Chief Human Relations Officer. Plaintiff agreed.

235.    On April 8, 2015, Plaintiff showed proof that the PFA had been vacated to Assistant Chief William Moerschbacher and requested that Plaintiff be permitted to return to her normal work hours.

236.    Lt. Moerschbacher told Plaintiff that Penn State could not return Plaintiff to her normal work hours because Plaintiff was "still considered a threat" to Officer Renninger.

237.    Plaintiff asked how this was possible since a judge had decided that Plaintiff was not a threat to Officer Renninger.

238.    Lt. Moerschbacher told Plaintiff it did not matter, that they still considered Plaintiff a threat, and that Plaintiff would still need to seek permission to work her reduced hours.

**April 14, 2015 – Plaintiff's Makes a Written Request
For an Administrative Directive**

239.    On April 8, 2015, Mr. Shaha emailed Plaintiff to inquire about the results of the PFA hearing.

240.    Plaintiff responded with an update about the new hearing date and reported that University Police would not permit Plaintiff to work without asking permission even though the temporary PFA was vacated.

241.    On April 14, 2015, Mr. Shaha emailed Plaintiff to ask her if she was interested in an administrative directive and to find out if Ms. Borges had been in contact with Plaintiff.

242.    In Plaintiff's email response to Mr. Shaha, Plaintiff stated, "No Carmen has not been in contact with me. I would only be interested in the administrative directive if it says she has to stay away from me. Not both ways due to issues with work. I am still not able to come to work without seeking permission despite the fact that the PFA was lifted. Also, I would like to talk about filing a [Title] IX against Lt. Grimm."

243.    Mr. Shaha failed to respond to Plaintiff's request for an administrative directive and Plaintiff did not receive any further communication from Mr. Shaha about her request for an administrative directive.

244.    Upon information and belief, Penn State did not issue any administrative directive.

245.    Mr. Shaha also did not respond to Plaintiff's request to file a Title IX complaint against Lt. Grimm.

**April 22, 2015 – Officer Renninger Withdraws PFA;
Plaintiff's Work Restrictions Remain In Effect**

246.    On April 22, 2015, Officer Renninger withdrew her petition for a PFA. Accordingly, a final PFA was never entered against Plaintiff.

247.     Plaintiff hoped this would allow her to return to work.

248.     Notwithstanding the absence of a PFA, Plaintiff's continued complaints, and Plaintiff's status as the victim of sexual harassment, Plaintiff continued to be retaliated against by being offered significantly reduced work hours.

249.      Plaintiff continued to have to seek special permission from Lt. Moerschbacher so that Plaintiff could adjust her work schedule around Officer Renninger's schedule.

250.     Upon information and belief, University Police permitted Officer Renninger to continue to work the hours she chose.

251.     This unjustified punishment for Plaintiff's complaints had a significantly negative impact not only on Plaintiff's economic situation but also on Plaintiff's ability to function as a student, including but not limited to:

(a)     Plaintiff had to borrow money from her parents and family members to pay her monthly bills.

(b)     Plaintiff could not afford her books for her classes and was not able to do her work for her courses.

(c)     Plaintiff needed medical treatment many times over the semester due to stress-related illnesses, like stomachaches and headaches. Additionally, Plaintiff had trouble sleeping due to stress and would fall asleep in her classes.

(d)     Plaintiff was forced to miss class to order to meet with administrators and her PFA lawyer.

252.     In addition to financial constraints, Plaintiff faced continued harassment at work. For example, other Auxiliary Officers made snide comments about Plaintiff when she walked b and they would try to walk around Plaintiff and made comments like, "[o]h, I better stay away or she will file a Title IX against me."

253.   Plaintiff was ostracized and frequently spent her work hours doing paperwork in an office alone.

254.   Although Lt. Grimm was well aware of the workplace environment, she took no steps to change it.

255.   On April 30, 2015, Plaintiff emailed Mr. Shaha to inform him that Officer Renninger dismissed her PFA petition but that Plaintiff still needed to seek permission to work. Plaintiff also requested that Mr. Shaha take steps to address this situation.

256.   Plaintiff also reiterated to Mr. Shaha that Ms. Borges had not yet contacted Plaintiff to conduct an investigation – a full two months after Plaintiff's complaint.

257.   In fact, contrary to Mr. Shaha's repeated assertions to Plaintiff that Penn State was investigating Plaintiff's complaint, more than eighty-six days after Plaintiff initially reported Officer Renninger's harassment, no investigation had yet taken place. Penn State had not contacted either Plaintiff or her witnesses.

258.   Mr. Shaha did not respond to Plaintiff's email.

**May 5, 2015 – Carmen Borges Sends "Results Of Investigation" Email**

259.   On May 5, 2015, over ninety days after Plaintiff initially reported sexual harassment to Mr. Gray, Plaintiff finally received an email from Ms. Borges, with Timothy Mercer, Assistant Vice President of University Police and Public Safety, and Kari Allatt, Employee Relations Officer in the Office of Human Resources, copied on the email.

260.   The email included an attached letter that contained "the results of [Ms. Borges'] investigation" based on Plaintiff's initial complaint. Ms. Borges stated that there were "conflicting accounts" of the incidents reported, but nonetheless recommended that Plaintiff "be reconsidered for a promotion, utilizing standard promotion procedures in place at the time [Plaintiff] applied."

261.    Ms. Borges ended the letter by indicating that Dr. Lehrman concurred with her findings.

262.    Plaintiff was surprised to hear that Penn State's "investigation" into her complaints had been concluded, given that Penn State never contacted Plaintiff for an interview, and, to the best of Plaintiff's knowledge, never contacted Plaintiff's witnesses.

263.    Plaintiff was also extremely disappointed that Penn State did not offer Plaintiff any information regarding how Penn State planned to address Plaintiff's numerous complaints that had raised serious concerns about Officer Renninger's harassment of Plaintiff and Lt. Grimm's retaliation against Plaintiff.

264.    On May 16, 2015, Plaintiff emailed Ms. Borges, Mr. Gray, Dr. Lehrman, and Mr. Shaha, seeking clarification about Ms. Borges' letter. Plaintiff asked if Penn State's investigation was in regards to Plaintiff's Title IX complaint against Ms. Renninger or Plaintiff's complaints about Lt. Grimm. Plaintiff also sought clarification on when Plaintiff would receive a promotion and when Plaintiff could stop asking for permission to work.

265.    On May 19, 2015, Ms. Borges responded to Plaintiff's email by requesting that Plaintiff meet with her in her office.

266.    On May 26, 2015, Plaintiff responded to Ms. Borges' email and asked if Plaintiff could record the meeting and bring a friend.

267.    In response, on May 27, 2015, Ms. Borges did not move forward with a proposed meeting and instead offered clarification via email. In the email, Ms. Borges stated that her investigation "refers to both your sexual harassment complaint and the complaint concerning Diane Grimm."

268.    Ms. Borges further stated that since Officer Renninger stopped sending inappropriate text messages, this "complied with the resolution of your complaint."

269.    Finally, Ms. Borges wrote that Plaintiff's reconsideration for promotion was recommended to "new administration in police services" and she "[didn't] know" their final decision on the matter.

270.    Due to the emotional distress Plaintiff had suffered based on the actions of Lt. Grimm, Ms. Renninger, and Penn State, as well as the considerable time Plaintiff had to spend unsuccessfully attempting to get Penn State to properly address Plaintiff's complaints and to ensure Plaintiff's safety, Plaintiff was unable to adequately tend to her coursework throughout the semester.

271.    Plaintiff's grades dropped significantly in two of her classes.

272.    As a result, Plaintiff had no other choice but to request a "trauma drop" for the semester to drop her classes, rather than use the grades towards her overall grade point average.

273.    On May 17, 2015, Ms. Lorah granted Plaintiff's request for the trauma drop.

### Summer 2015 − Plaintiff Experiences Continued Harassment and Retaliation

274.    While Lt. Grimm was demoted from a coordinator to patrol duty and was not allowed to supervise students moving forward, Plaintiff maintained her rank and continued her work at University Police.

275.    Throughout Summer 2015, Plaintiff had to have contact with Lt. Grimm in the workplace and Officer Renninger continued to work at University Police.

276.    Lt. Grimm made the workplace even more uncomfortable for Plaintiff. Lt. Grimm maintained her office in the same location where Plaintiff needed to put in her paperwork each week. Lt. Grimm also stared and glared at Plaintiff when Plaintiff came into the office.

277.    Plaintiff also learned that Lt. Grimm started stalking Plaintiff and Lt. Persico off-campus in a patrol car, including following them to Plaintiff's apartment.

278.    Additionally, due to Lt. Persico's personal relationship with Plaintiff, Lt. Grimm began retaliating against him as well. For example:

(a)    Although highly qualified, Lt. Persico had applied for several positions at the Penn State Police department but was denied on multiple occasions, without even an interview.

(b)    Lt. Grimm took it upon herself to complain about Lt. Persico's work and recommended that he not be hired at Patton Township Police, even though he had neither submitted an application there nor listed her as a reference on any applications.

279.    Officer Renninger also continued to attempt contact Plaintiff at the workplace. For example:

(a)    Officer Renninger tried bringing Plaintiff into conversations with other people and talked loudly to let Plaintiff know that she was present.

(b)    In September 2015, Officer Renninger approached Officer Renninger and asked if they could talk in private. Plaintiff refused and stated that any conversations between them would need to take place in front of Lt. Jason Zajac, the new supervisor who replaced Lt. Grimm.

(c)    Officer Renninger complained that Plaintiff had her personal items at Plaintiff's apartment and that she needed them back. Plaintiff stated that she did not have any of Officer Renninger's items and told Officer Renninger to leave her alone.

**<u>Plaintiff's Leave of Absence and Continued Harm</u>**

280.    Penn State's failure to appropriately address Plaintiff's complaints caused Plaintiff to decide to enter the military earlier than she had planned.

281.    Plaintiff made the decision to remove herself from the environment at Penn State and University Police, which felt unsafe and had become intolerably hostile.

282.    On August 22, 2015, Plaintiff obtained a leave of absence from Penn State for her military service.

283.    Plaintiff felt the need to remove herself from Penn State in order to get away from Officer Renninger.

284.    Plaintiff dropped classes that were essential to progress towards her degree, lost many hours of work, entered the military earlier than expected, and ultimately took a leave of absence from her studies.

285.    Additionally, Plaintiff lost grants earned based on her academic performance.

286.    Since Plaintiff had no choice but to enter the military earlier than expected, Plaintiff's earning capacity and career trajectory was derailed. When Plaintiff entered the military to escape the harassment and retaliation that Plaintiff was facing at Penn State, Plaintiff entered at a significantly lower rank than she had planned.

### FACTS RELEVANT TO PLAINTIFF'S TITLE IX, SECTION 1983, AND ALL COMMON LAW CLAIMS

### Plaintiff Re-Enrolls at Penn State, Returns to University Police, is Sexually Harassed and Assaulted by Another University Police Co-Worker

287.    In Fall 2016, Plaintiff re-enrolled at Penn State to complete her studies. Plaintiff also returned to her position with Penn State's University Police.

288.    During Fall 2016, Plaintiff caught up with a co-worker, Doe, during Plaintiff's University Police shifts.

289.    Plaintiff had known Doe since August 2013 because they worked the same shift and detail.

290.     Plaintiff had previously invited Doe over to her apartment to socialize.

291.    In Fall 2016, University Police promoted Doe to a Manager position above Plaintiff.

292.    In Fall 2016, Doe told Plaintiff that two female Auxiliary Officers had accused him of sexual misconduct by filing complaints against him. Doe told Plaintiff that the women were lying.

293.    Plaintiff believed Doe because she did not know the female Auxiliary Officers very well and because Plaintiff and Doe were friends.

294.    In Fall 2016, Doe told Plaintiff that he liked her more than friend. Plaintiff explained to Doe that she did not feel the same way and that she was happy with her three-year relationship with her boyfriend.

295.    On January 27, 2017, Plaintiff was working until 9:00 p.m. Plaintiff invited Doe and Frank Piatrowski, another friend and co-worker, to come over to her apartment after the shift for some drinks.

296.    Officer Piatrowski declined Plaintiff's invitation, but Doe accepted Plaintiff's invitation.

297.    Plaintiff later learned that while she was changing in another room, Doe pulled handcuffs from his duffle bag and told Officer Piatrowski what he planned to do to Plaintiff.

298.    After Plaintiff changed her clothes, Plaintiff told Doe that he would need to arrange for a ride home since they would be drinking. Doe told Plaintiff that he texted his roommate to pick him up.

299.    At Plaintiff's apartment, Plaintiff and Doe ordered pizza and drank vodka. When the pizza arrived, Plaintiff left her drink unattended to while she paid for the pizza.

300.    Plaintiff and Doe ate pizza and talked and Plaintiff had a few shots of vodka that Doe poured for her. Doe did not seem to be drinking as much vodka, even though he kept pouring shots for Plaintiff.

301.     During the early morning hours of January 28, 2017, Plaintiff became incapacitated. Doe carried Plaintiff to her bedroom and engaged in sexual intercourse without Plaintiff's knowledge or consent (the "January 28, 2017 Incident").

302.     When Plaintiff woke that morning, Plaintiff learned that Doe had sexual intercourse with her and that Doe did not use a condom.

303.     Plaintiff did not consent to any sexual activity with Doe.

304.     Although Plaintiff was upset, Doe told Plaintiff to "stop crying" and "get over it."

305.     Doe eventually left Plaintiff's apartment.

306.     Plaintiff later went to Mount Nittany Medical Center to be examined because she was bleeding and in pain.

307.     Plaintiff was swollen and tender. The Mount Nittany Medical Center nurses had to make several attempts at a pelvic examination because Plaintiff was so swollen.

308.     Since Doe told Plaintiff that he did not use a condom, the nurses gave Plaintiff HIV and STD medication.

309.     The HIV medication made Plaintiff sick, causing Plaintiff not to pass a physical exam for the military, which set Plaintiff's military career back.

310.     Since the January 28, 2017 Incident, Plaintiff has nightmares, feels anxiety when she is alone, and has trouble trusting others.

311.     Further, Plaintiff was constantly reminded of Doe while at work because she saw his name on the University Police employee list.

312.     The January 28, 2017 Incident negatively impacted Plaintiff's health, her studies, her relationships, and her career.

**Officer Piatrowski Reports the January 28, 2017 Incident to Penn State;**
**Penn State Opens a Title IX Investigation**

313.     Plaintiff reported the January 28, 2017 Incident to her friend and co-worker, Officer Piatrowski.

314.     On or about January 28, 2017, Officer Piatrowski filed an anonymous Title IX complaint regarding the January 28, 2017 Incident.

315.     Thereafter, Penn State opened a Title IX investigation.

316.     As part of Penn State's Title IX investigation, Plaintiff participated in three interviews:

(a)     On January 30, 2017, Plaintiff and her attorney met with Paul Apicella, Penn State's former Title IX Coordinator.

(b)     On February 10, 2017, Plaintiff and her attorney met with Chris Harris, Penn State's Title IX Investigator. Mr. Harris told Plaintiff that Penn State's investigation should take approximately 60 days.

(c)     On March 17, 2017, Plaintiff and her attorney again met with Mr. Harris. Mr. Harris told Plaintiff that Doe wanted to submit a polygraph examination. Plaintiff objected to Doe's submission of a polygraph examination. Plaintiff also informed Mr. Harris that two other female students who worked in the University Police office had filed complaints against Doe, which alleged sexual assault.

317.     On April 14, 2017, Mr. Harris informed Plaintiff that he was working on his investigative report.

318.     On May 16, 2017, Mr. Harris informed Plaintiff that he completed a draft investigative report. Mr. Harris informed Plaintiff that Doe's polygraph examination results would be included in the investigative report, despite Plaintiff's objection.

319.    On May 25, 2017, Plaintiff met with Mr. Harris to review the investigative report.

320.    On July 24, 2017, Mr. Harris contacted Plaintiff to schedule another meeting to review a revised investigative report.

321.    On August 7, 2017, Plaintiff met with Mr. Harris to review an updated investigative report. During this meeting, Mr. Harris mentioned that he met with Doe three times over the summer. Plaintiff reminded Mr. Harris about the two prior complaints of alleged sexual assault made against Doe. Mr. Harris indicated that he would ask Doe's supervisor if there were any prior complaints filed against Doe.

322.    On August 15, 2017, Mr. Harris indicated that he submitted his investigative report to the Office of Student Conduct for review.

### Penn State Issues Two Major Charges to Doe; Doe Contests the Charges

323.    On October 12, 2017, Karen Feldbaum, Interim Senior Director, Office of Student Conduct, issued two major charges to Doe:

(a)     2.05 – Nonconsensual Intercourse

(b)     2.07 – Sexual Misconduct Involving an Incapacitated Person, which Penn State defines as "engaging in sexual activity with a person who is unable to give reasonable consent due to incapacitation resulting from substance abuse, captivity, sleep, or disability." http://www.psu.edu/ur/2014/Task_Force_final_report.pdf (accessed May 18, 2018).

324.    Ms. Feldbaum issued the following sanctions to Doe: Indefinite expulsion with August 15, 2018 being the first time Penn State would consider re-enrollment; psychiatric evaluation prior to readmission; favorable evaluation; counseling required for readmission.

325.    Doe contested the charges that Ms. Feldbaum issued to him.

326.    Had Ms. Feldbaum decided not to charge Doe, Penn State had no method in

place for Plaintiff to contest such a decision. *See* Exhibit "A" ("If the acquired information does not reasonably support charges, then the case will be closed without charges, and both parties will be notified.").

### November 28, 2017 – The Title IX Decision Panel

327.    Since Doe contested the charges, the matter was scheduled for a hearing before a Title IX Decision Panel.

328.    According to the Code of Conduct, a Title IX Decision Panel is "a specific group of faculty and staff authorized . . . to review cases alleging Title IX violations that have been assigned to them, to determine whether a student has violated the Student Code of Conduct, and to assign sanctions in response to violation(s). *See* https://studentaffairs.psu.edu/support-safety-conduct/student-conduct/code-conduct (accessed May 21, 2018).

329.    On November 28, 2017, Plaintiff attended and participated in Penn State's Title IX Decision Panel hearing.

330.    At the Title IX Decision Panel hearing, Plaintiff again objected to Doe's introduction of a Polygraph Examination Report, which was an unreliable party third-party report. Notably, Doe's Polygraph Examination Report included only four questions that used to the term "that girl" instead of Plaintiff's name.

331.    The Title IX Decision Panel also permitted Doe to submit new information. Plaintiff objected to Doe's submission of new information because this violated Penn State's Title IX Protocol. *See* Exhibit "A" ("When the hearing convenes, no new information may be provided to the hearing authority, . . .").

332.    Later on November 28, 2017, Ms. Feldbaum informed Plaintiff that the Decision Panel completed their review and determined that Doe would not be charged with a violation of the Code of Conduct.

333.    On December 5, 2017, Penn State's Title IX Decision Panel issued a decision that Doe did not violate sections 2.05 – Non-Consensual Intercourse or category 2.07 – Sexual Misconduct Involving Incapacitated Person of Penn State's Code of Conduct.

334.    On December 14, 2017, Plaintiff submitted an appeal of the Title IX Decision Panel's decision.

335.    On January 5, 2018, Penn State denied Plaintiff's appeal of Penn State's Title IX Decision Panel's decision.

336.    On January 25, 2018 – almost exactly one year following the January 28, 20-17 Incident – Plaintiff learned that Penn State denied her appeal request.

337.    During this time period, Plaintiff never received a timeline for Penn State's investigation and was not informed that Penn State's investigation would take longer than 60 days.

**FACTS RELEVANT TO PLAINTIFF'S EPA CLAIM**

338.    From January 2017 until May 2018, Doe was on a leave of absence. Penn State did not fill Doe's position with University Police, which was Lieutenant/Hiring Manager.

339.    From January 2017 until May 2018, Plaintiff did Doe's job duties since Doe was on a leave of absence.

340.    Despite doing Doe's job duties, Penn State did pay Plaintiff the same hourly rate that Penn State paid to Doe, which was higher than Plaintiff's hourly rate.

341.    On March 20, 2018, University Police promoted Plaintiff promoted to Lieutenant.

342.    On May 5, 2018, Plaintiff graduated from Penn State and left her position with the University Police since she is no longer a student.

**COUNT I**
**Violations of Title VII**
**Sexual Harassment − Hostile Work Environment**
**Plaintiff v. Penn State**

343.    Plaintiff incorporates by reference paragraphs 1 through 342 as though the same were set forth at length herein.

344.    Taken together, the acts outlined above constitute a hostile work environment based on sex.

345.    Plaintiff suffered intentional discrimination because of her membership in a protected class − female.

346.    Such harassment was severe, pervasive, and regular.

347.    Such harassment detrimentally affected Plaintiff.

348.    Such harassment would detrimentally affect a reasonable person of the same protected class in Plaintiff's position.

349.    Penn State knew or should have known of the harassment and failed to take prompt remedial action. Lt. Grimm had actual knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action.

350.    When Plaintiff went through the appropriate channels to alert her supervisors of sexual harassment, Penn State repeatedly punished Plaintiff for doing so.

351.    Penn State's failure to protect Plaintiff from this environment is particularly egregious in light of the fact that Plaintiff was in a law enforcement workplace.

352.    Penn State's conduct has been intentional, deliberate, willful, and in callous disregard of Plaintiff's rights.

353.    As a result of Penn State's actions and conduct, Plaintiff has suffered emotional pain and distress, mental anguish, and loss of enjoyment of life's pleasures.

354.    Penn State's policies and practices have harmed Plaintiff with respect to the terms and conditions of her employment.

355.    By reason of Penn State's retaliation, Plaintiff is entitled to all legal and equitable remedies available under Title VII.

**COUNT II**
**Violations of Title VII**
**Retaliation**
**Plaintiff v. Penn State**

356.    Plaintiff incorporates by reference paragraphs 1 through 355 as though the same were set forth at length herein.

357.    Penn State is also liable for numerous instances of unlawful retaliation in violation of Title VII.

358.    As averred above, Plaintiff engaged in protected activity by complaining to her supervisors and numerous Penn State officials about illegal sexual harassment in the workplace.

359.    As averred above, following Plaintiff's protected activity, Penn State subjected Plaintiff to adverse actions, including being passed over for promotion on several occasions, being threatened with termination, having her hours cut significantly while the perpetrator of Plaintiff's sexual harassment was permitted to continue to work longer hours, and having to seek special permission to work from a supervisor.

360.    Penn State retaliated against Plaintiff in violation of Title VII.

361.    Penn State's conduct has been intentional, deliberate, willful, and in callous disregard of Plaintiff's rights.

362.    Penn State's policies and practices have harmed Plaintiff with respect to the terms and conditions of her employment.

363.    By reasons of Penn State's retaliation, Plaintiff is entitled to all legal and equitable remedies available under Title VII.

## COUNT III
### Violations of the PHRA
### Sexual Harassment − Hostile Work Environment and Retaliation
### Plaintiff v. Penn State

364.    Plaintiff incorporates by reference paragraphs 1 through 363 as though the same were set forth at length herein.

365.    The actions taken by Penn State as described above were unlawful and in violation of the PHRA.

366.    As a direct result of Penn State's willful and unlawful actions in discriminating and retaliating against Plaintiff in violation of Plaintiff's rights under the PHRA, Plaintiff has suffered great humiliation, embarrassment, discomfort, and suffering; moreover, Plaintiff has been damaged in entering into further employment relationships, has suffered a loss of earnings and employment benefits and a severely diminished earning capacity and may continue to suffer such losses in the future.

## COUNT IV
### Violations of Title IX
### Plaintiff v. Penn State and Penn State Board of Trustees

367.    Plaintiff incorporates by reference paragraphs 1 through 366 as though the same were set forth at length herein.

368.    The sex-based harassment articulated in Plaintiff's general allegations was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational benefits provided by the school.

369.    Defendants created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX because:

46

(a)     Plaintiff, a female student, is a member of a protected class;

(b)     Plaintiff was subjected to sexual harassment in the form of a sexual assault by another student;

(c)     Defendants created the circumstances that permitted the sexual assault to take place because Defendants failed to follow normal reporting and investigative procedures where members of University Police were involved;

(d)     Defendants' failure to follow normal protocols in order to protect the university cultivated an environment in which female student employees became vulnerable to sexual harassment, including sexual assault;

(e)     Plaintiff was subjected to a hostile educational environment created by Defendants' lack of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment and/or lack of implementation of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment.

370.   Defendants' failure to promptly and appropriately respond to the sexual harassment resulted in Plaintiff, on the basis of her sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in Penn State's education program in violation of Title IX.

371.   Defendants failed to take immediate, effective remedial steps to resolve the complaint of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

372.   Defendants persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

373.   Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually assaulted from seeking assistance and protection,

including but not limited to inadequate communication of its sexual misconduct policies; failure to conduct a prompt investigation; failure to follow Penn State's policies, Title IX Protocol, and Title IX; and providing preferential treatment to Doe, a male student.

374.    This policy or practice constitutes disparate treatment of female students and has a disparate impact on female students.

375.    Plaintiff has suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of earnings, loss of earning capacity, and past and ongoing medical expenses as a direct and proximate result of Defendants' deliberate indifference to her rights under Title IX.

**COUNT V**
**Violations of Section 1983**
**Plaintiff v. Penn State and Penn State Board of Trustees**

376.    Plaintiff incorporates by reference paragraphs 1 through 375 as though the same were set forth at length herein.

377.    Under the Fourteenth Amendment, Plaintiff, a female university student, had the right to Equal Protection of Laws.

378.    Defendants failed to preserve Plaintiff's constitutional right to equal protection as guaranteed by the Fourteenth Amendment.

379.    Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff had the right to equal access to an educational environment free from harassment and discrimination.

380.    Defendants should have known that their response to sexual assault allegations must comply with federal law, particularly as outlined in Title IX's published and widely promulgated implementing regulations.

381.    At all relevant times, Defendants acted through their employees who were state actors acting under the color of state law.

382.     Defendants subjected Plaintiff to violations of her right to and Equal Protection of Laws by maintaining a custom, policy, and/or procedure that failed to take steps to protect Plaintiff as necessary; treated Plaintiff with deliberate indifference; and failed to provide and/or failing to implement an unbiased grievance procedure for students to file complaints of sexual discrimination, including complaints of sexual violence.

383.     Defendants also violated Plaintiff's Fourteenth Amendment right to equal protection by failing to properly train and supervise Penn State administrators, officials, and employees as to their mandated investigative requirements.

384.     Defendants' policies and/or practices constitute disparate treatment of females and had a disparate impact on female students.

385.     Further, the sexual assault that Plaintiff suffered constituted a violation of Plaintiff's Fourteenth Amendment right to freedom from invasion of her personal security through sexual abuse.

386.     Defendants' conduct has been intentional, deliberate, willful, and with callous disregard of Plaintiff's rights.

387.     Defendants' actions and lack of actions were the proximate cause of Plaintiff's emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of earnings, loss of earning capacity, and past and ongoing medical expenses, resulting from Penn State's deliberate indifference to Plaintiff's right to equal protection under the Fourteenth Amendment.

388.     Plaintiff is entitled to all legal and equitable remedies available under Section 1983.

**COUNT VI**
**Violations of the Equal Pay Act**
**Plaintiff v. Penn State**

389.    Plaintiff incorporates by reference paragraphs 1 through 388 as though the same were set forth at length herein.

390.    As averred above, between January 2017 and May 2018, Plaintiff did Doe's job duties since Doe was on a leave of absence, which required equal skill, effort, and responsibility under similar working conditions.

391.    Penn State violated the EPA by paying Plaintiff less than Doe.

392.    Penn State's conduct has been intentional, deliberate, willful, and in callous disregard of Plaintiff's rights.

**COUNT VII**
**Breach of Contract**
**Plaintiff v. Penn State**

393.    Plaintiff incorporates by reference paragraphs 1 through 392 as though the same were set forth at length herein.

394.    The contract between an educational institution and its students includes its policies that apply to students.

395.    Thus, Policy AD-85 and the Code of Conduct created contractual obligations that Penn State owed to Plaintiff.

396.    As set forth in significant detail above, Penn State beached numerous obligations that it owed to Plaintiff, including but not limited to:

(a)     Failing to follow Policy AD-85 and Penn State's Title IX Protocol after Plaintiff reported Officer Glen-Roundtree's sexual harassment of Plaintiff;

(b)     Failing to follow Policy AD-85 and Penn State's Title IX Protocol after Plaintiff reported Officer Renninger's sexual harassment of Plaintiff;

(c)      Retaliating against Plaintiff on numerous occasions after Plaintiff reported violations of Policy AD-85, which is also a breach of Policy AD-85; and

(b)      Failing to follow Penn State's Title IX Protocol with regards to Doe.

397.    As a result of Penn State's numerous breaches, Plaintiff has suffered damages.

**COUNT VIII**
**Negligence**
**Plaintiff v. Penn State**

398.    Plaintiff incorporates by reference paragraphs 1 through 397 as though the same were set forth at length herein.

399.    As averred above, two female students filed alleged sexual assault complaints against Doe.

400.    Penn State knew or should have known of these prior complaints.

401.    Penn State owed Plaintiff a duty to investigate all allegations of sexual assault, including those against Doe, and knew or should have known that Doe was a danger to Plaintiff and other female students.

402.    Penn State breached this duty by:

(a)      Failing to provide adequate training to supervisors in the University Police department;

(b)      Failing to adequately investigate the prior complaints against Doe;

(c)      Failing to ensure the safety of their student employees; and

(d)      Other negligence acts under the circumstances.

403.    As both a direct and proximate cause of Penn State's negligence, Plaintiff suffered severe injuries without limitation, to his face causing him anxiety, fear, embarrassment, severe and permanent physical and emotional injury, lost wages, lost earning capacity, and loss of life's pleasures.

**COUNT IX**
**Negligence**
**Plaintiff v. Doe**

404.     Plaintiff incorporates by reference paragraphs 1 through 403 as though the same were set forth at length herein.

405.     Doe owed Plaintiff a duty not to cause injury to Plaintiff.

406.     Doe breached this duty by negligently:

(a)      Causing Plaintiff to become intoxicated;

(b)      Causing himself to come into sexual contact with Plaintiff without Plaintiff's consent; and

(c)      Other negligence acts under the circumstances.

407.     As both a direct and proximate cause of Doe's negligence, Plaintiff suffered severe injuries without limitation, to his face causing him anxiety, fear, embarrassment, severe and permanent physical and emotional injury, lost wages, lost earning capacity, and loss of life's pleasures.

**COUNT X**
**Assault and Battery (In The Alternative)**
**Plaintiff v. Doe**

408.     Plaintiff incorporates by reference paragraphs 1 through 407 as though the same were set forth at length herein.

409.     Doe intentionally, knowingly and/or recklessly had sexual intercourse with Plaintiff without her consent with and placed Plaintiff in fear of being sexually assaulted.

410.     Doe intentionally, knowingly and/or recklessly physically contacted Plaintiff representing indecent contact that a reasonable person should not be expected to tolerate.

411.    As both a direct and proximate cause of Doe's assault and battery, Plaintiff suffered injuries without limitation, to her body, fear, embarrassment, severe and permanent emotional injury, lost wages, lost earning capacity, and loss of life's pleasures.

**WHEREFORE**, Plaintiff respectfully requests this Court to:

(a)    Issue a Declaratory Judgment declaring that Penn State's actions, as set forth in this Complaint, violated Plaintiff's rights under Title VII, the PHRA, Title IX, Section 1983, and the EPA and that the Penn State Board's actions, as set forth in this Complaint, violated Plaintiff's rights under Title IX and Section 1983;

(b)    Enjoin and restrain Penn State, the Penn State Board, and all other persons acting on behalf of, or in concert with, Penn State and the Penn State Board from engaging in such unlawful practices.

(c)    Enter judgment in favor of Plaintiff, and against Penn State, for back pay in the amount of wages and fringe benefits it is determined that Plaintiff lost as a result of Penn State's unlawful conduct, together with interest.

(d)    Enter judgment in favor of Plaintiff and against Penn State, placing Plaintiff in the position she would have had absent Penn State's unlawful conduct. In the alternative, award Plaintiff front pay in the amount of wages and benefits it is determined that Plaintiff would lose because of Penn State's unlawful conduct.

(e)    Enter judgment in favor of Plaintiff, and against Defendants Penn State and Doe, for compensatory and punitive damages, as allowable by law, including but not limited to, damages for emotional distress, together with interest.

(f)    Award Plaintiff reasonable attorney's fees together with the costs of this action.

(g)    Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Plaintiff's rights, to prevent their recurrence in the future and to protect other employees from such unlawful behavior.

## JURY DEMAND

Plaintiff hereby demands a jury to try all claims triable by jury.

Dated: May 21, 2018

Stephanie J. Mensing
PA ID No. 89625
Mensing Law LLC
1635 Market Street, Suite 1600
Philadelphia, PA 19103
(215) 586-3751; (215) 359-2741 fax
Attorney for Plaintiff