**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANE ROE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 18-2142 |
| | : | |
| THE PENNSYLVANIA STATE UNIVERSITY and JOHN DOE, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                    **FEBRUARY 15, 2019**

Plaintiff Jane Roe ("Roe") was a student at Defendant The Pennsylvania State University ("Penn State") from August 2012 to August 2015, and August 2016 to May 2018. The two periods of time essentially function as two separate chapters of the case, with the former involving claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*, and breach of contract. The latter period, which is at issue for purposes of the instant motions, involves claims under Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, 42 U.S.C. § 1983, the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), breach of contract, and negligence or, in the alternative, assault and battery.

Presently before the Court are Penn State and Defendant John Doe's ("Doe") Motions to Dismiss. Penn State seeks dismissal of Roe's Title IX and Section 1983 claims for failure to state a claim. Doe seeks dismissal of the negligence and alternative assault and battery claims on

the basis that the Court does not have supplemental jurisdiction over them. For the reasons that follow, Penn State and Doe's Motions are granted.

## I.     BACKGROUND

Roe enrolled as an undergraduate student at Penn State in August 2012 and began working for Penn State's University Police as a Student Auxiliary Officer in August 2013.[1] (Am. Compl. ¶¶ 38-39.) On August 22, 2015, she obtained a leave of absence from Penn State to enter the military. (*Id.* ¶ 282.) In the fall of 2016, Roe re-enrolled at Penn State to complete her studies and resumed her position with the University Police.[2] (*Id.* ¶ 287.)

When Roe returned to Penn State, she "caught up" with another auxiliary officer, Doe, whom she had known since August 2013 because the two worked the same shift and detail. (*Id.* ¶¶ 288-89.) Doe told Roe that two female auxiliary officers previously filed complaints against him that accused him of sexual misconduct. (*Id.* ¶ 292.) Roe alleges, upon information and belief, that Penn State had actual knowledge of the two prior complaints filed against Doe; that the two prior complaints were filed with an appropriate person at Penn State who had authority to investigate and take remedial action; that Penn State did not properly investigate the two prior complaints; and that Penn State did not discipline Doe. (*Id.* ¶¶ 293-95.) Doe told Roe that the two sexual misconduct complaints were investigated and that the two female auxiliary officers were lying. (*Id.* ¶¶ 296-97.) Roe claims that she believed Doe "because she did not know the female Auxiliary Officers very well and because [she] and Doe were friends." (*Id.* ¶ 298.) Doe

---

[1] We take the facts alleged in the Amended Complaint as true, as we must when deciding a motion under Federal Rule of Civil Procedure 12(b)(6). *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted).

[2] A substantial number of allegations between August 2013 and August 2015 form the basis of Roe's Title VII, PHRA, and breach of contract claims. Because resolution of the instant motions relates to allegations between August 2016 and May 2018, we recount only those facts.

also told Roe that he liked her more than a friend, but the feelings were not reciprocated, as Roe told him that she was happy with her three-year relationship with her boyfriend. (*Id.* ¶ 299.)

On January 27, 2017, Roe was working until 9:00 p.m. and invited Doe and another co-worker, Frank Piotrowski ("Piotrowski"), to come over to her apartment after the shift for some drinks. (*Id.* ¶ 300.) Piotrowski declined Roe's invitation, but Doe accepted. (*Id.* ¶ 301.) Roe had invited Doe to her apartment to socialize on prior occasions. (*Id.* ¶ 290.) After Roe invited Doe and Piotrowski to her apartment, she claims she later learned "that while she was changing in another room, Doe pulled handcuffs from his duffle bag and told Officer Piotrowski what he planned to do to [her]." (*Id.* ¶ 302.) Roe told Doe that he would need to arrange for a ride home because they would be drinking, to which the latter stated that his roommate would pick him up. (*Id.* ¶ 303.)

The two "ordered pizza and drank vodka" at Roe's apartment. (*Id.* ¶ 304.) When the pizza arrived, Roe left her drink unattended while she paid for the pizza. (*Id.*) She alleges she had "a few shots of vodka that Doe poured for her" as they ate pizza and talked. (*Id.* ¶ 305.) She further claims that Doe did not appear to be drinking as much vodka as she, even though he kept pouring shots for her. (*Id.*)

During the early morning of January 28, 2017, Roe became incapacitated. (*Id.* ¶ 306.) She alleges Doe carried her to her bedroom and engaged in sexual intercourse with her without her knowledge or consent. (*Id.*) When Roe awoke in the morning, she learned that Doe had sex with her and that he did not use a condom. (*Id.* ¶ 307.) Even though Roe was visibly upset, Doe told her to "stop crying" and to "get over it." (*Id.* ¶ 309.) After Doe eventually left Roe's apartment, she later went to Mount Nittany Medical Center to be examined because she was bleeding and in pain. (*Id.* ¶ 311.) Because Doe told her that he did not use a condom, the nurses

gave Roe HIV medication. (*Id.* ¶ 313.) This medication made Roe sick, which she claims caused her to fail a physical exam for the military and subsequently set her military career back. (*Id.* ¶ 314.)

That same day, Roe reported the incident to Piotrowski, who filed an anonymous Title IX complaint on behalf of Roe. (*Id.* ¶¶ 318-19.) Penn State opened a Title IX investigation within two days. (*See id.* ¶¶ 320-21(a).) Roe and her attorney met with Penn State's former Title IX coordinator, Paul Apicella, on January 30, 2017. (*Id.* ¶ 321(a).) On February 10, 2017, Roe and her attorney met with Penn State's new Title IX coordinator, Chris Harris ("Harris"), who stated the investigation into Roe's complaint should take approximately sixty days. (*Id.* ¶ 321(b).) The following month, Roe and her attorney again met with Harris, who stated that Doe wanted to submit a polygraph examination. (*Id.* ¶ 321(c).) Roe objected to Doe's polygraph submission. (*Id.*)

In April 2017, Harris informed Roe that he was working on his investigative report. (*Id.* ¶ 322.) The following month, he told Roe he had completed a draft report and was including Doe's polygraph examination results. (*Id.* ¶ 323.) Roe met with Harris on May 25 and June 24, 2017 to review the report. (*Id.* ¶ 324-25.) On August 7, 2017, Roe met with Harris to review an updated report. (*Id.* ¶ 326.) During that meeting, Harris informed Roe he had met with Doe three times over the summer. (*Id.*) On August 15, 2017, Harris indicated that he submitted his investigative report to the Office of Student Conduct for review. (*Id.* ¶ 327.)

On October 12, 2017, Karen Feldbaum ("Feldbaum"), the Interim Senior Director of the Office of Student Conduct, issued two major charges to Doe: (1) nonconsensual intercourse (charge code number 2.05); and (2) sexual misconduct involving an incapacitated person (charge code number 2.07), which is defined as "engaging in sexual activity with a person who is unable

to give reasonable consent due to incapacitation resulting from substance abuse, captivity, sleep, or disability." (*Id.* ¶ 328.) Feldbaum issued the following sanctions to Doe: indefinite expulsion with August 15, 2018 being the first time Penn State would consider re-enrollment; a favorable psychiatric evaluation prior to readmission; and required counseling prior to readmission. (*Id.* ¶ 329.)

Doe contested the charges. (*Id.* ¶ 330.) A hearing was then scheduled before a Title IX decision panel, which was composed of a group of faculty and staff authorized to review Title IX allegations, determine whether a violation of the Student Code of Conduct was committed, and assign sanctions in response to violations. (*Id.* ¶¶ 332-33.) The hearing took place on November 28, 2017, at which Roe spoke for approximately ten minutes. (*Id.* ¶ 334.) The Title IX panel did not ask her any questions. (*Id.*) Doe spoke for approximately forty-five minutes. (*Id.* ¶ 336.) During the hearing, Roe objected to Doe's introduction of the polygraph examination. (*Id.* ¶ 335.) The panel also allowed Doe to submit new information over Roe's objection, "including alleged hearsay statements made by a State College detective and police officer that they did not believe Plaintiff, that Plaintiff was lying about the January 28, 2017 Incident, and that the State College Police were not going to press charges against Doe and had cleared Doe of any wrongdoing." (*Id.* ¶¶ 335, 337.) Roe alleges Penn State did not allow her to present witness testimony or cross-examine Doe at the hearing. (*Id.* ¶ 339.)

Later that day, Feldbaum informed Roe that the Title IX panel completed their review and determined that Doe would not be charged with any violations of the Code of Conduct. (*Id.* ¶ 340.) On December 5, 2017, the panel issued a decision that Doe did not violate charge numbers 2.05 (non-consensual intercourse) or 2.07 (sexual misconduct involving an incapacitated person) of Penn State's Code of Conduct. (*Id.* ¶ 341.) Roe submitted an appeal of

the Title IX panel's decision and also requested a new panel for a hearing.  (*Id.* ¶¶ 345-46.)  On January 5, 2018, Penn State denied both requests.  (*Id.* ¶ 347.)

Roe alleges Doe was on a leave of absence between January 2017 and May 2018, during which she alleges she did Doe's job duties at the University Police.  (*Id.* ¶¶ 350-51.)  She alleges that even though Doe was paid at a higher hourly rate than she, Penn State continued to pay her the same lower hourly rate.  (*Id.* ¶ 352.)

After fulfilling all jurisdictional prerequisites, Roe filed suit in this Court against Penn State, the Pennsylvania State University Board of Trustees (the "Board of Trustees"), and Doe on May 21, 2018.  Doe filed a motion to dismiss based on lack of subject matter jurisdiction, and Penn State and the Board of Trustees filed a motion to dismiss several counts for failure to state a claim.  Roe filed a nine-count Amended Complaint in response to Penn State and the Board of Trustees' motion, which omits the Board of Trustees as a defendant.  The following counts are directed against Penn State: hostile work environment in violation of Title VII (Count I); retaliation in violation of Title VII (Count II); hostile work environment and retaliation in violation of the PHRA (Count III); violations of Title IX (Count IV); a violation of the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983 (Count V); a violation of the Equal Pay Act of 1963 (Count VI); and breach of contract (Count VII).  The following counts are directed against Doe: negligence (Count VIII); and, in the alternative, assault and battery (Count IX).

On September 7, 2018, Doe again filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, contending that he should be dismissed from the action because the Court lacks supplemental jurisdiction over the state law claims asserted against him.  On September 24,

2018, Penn State filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

arguing that the Title IX and Section 1983 claims should be dismissed for failure to state a claim.

## II.     LEGAL STANDARD

### A.     Rule 12(b)(1)

A party may challenge a court's subject matter jurisdiction under Federal Rule of Civil

Procedure 12(b)(1).  "At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the

case.'"  *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006) (footnote omitted) (quoting

*Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  A motion filed

under Rule 12(b)(1) may take two forms: (1) a facial attack, where the party contesting subject

matter jurisdiction attacks the face of the complaint; or (2) a factual attack, where the existence

of subject matter jurisdiction is attacked as a matter of fact.  *See id.* n.3.  "A facial attack

concerns an alleged pleading deficiency[,] whereas a factual attack concerns the actual failure of

a plaintiff's claims to comport factually with the jurisdictional prerequisites."  *Lincoln Ben. Life

Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (internal quotation marks and alterations

omitted); *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

When a party files a Rule 12(b)(1) motion that mounts a facial attack to subject matter

jurisdiction, a court may consider only "the allegations of the complaint and documents

referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Gould Elecs.

Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citations omitted).  In reviewing a factual

attack, on the other hand, a court "may consider evidence outside the pleadings," *id.*, but there is

"no presumptive truthfulness attache[d] to plaintiff's allegations," *Mortensen*, 549 F.2d at 891.

**B.      Rule 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)) (internal quotation marks omitted). However, courts need not "accept mere[] conclusory factual allegations or legal assertions." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 678-79). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555. Finally, we may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Davis*, 824 F.3d at 341 (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)) (internal quotation marks omitted).

**III.    DISCUSSION**

**A.      Penn State's Motion to Dismiss the Title IX and Section 1983 Claims**

**1.      *Title IX***

Title IX provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681(a). "Although Title IX does not expressly permit private enforcement suits,

the Supreme Court has found an implied private right of action for individuals to enforce Title IX

through monetary damages actions." *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (citing

*Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 76 (1992); *Cannon v. Univ. of Chi.*, 441 U.S.

677, 717 (1979)).

The Supreme Court has held that allegations of teacher-on-student and student-on-student

harassment are actionable under Title IX. *See Davis Next Friend LaShonda D. v. Monroe Cty.*

*Bd. of Educ.*, 526 U.S. 629, 643, 646-47 (1999) (student-on-student harassment); *Gebser v. Lago*

*Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998) (teacher-on-student harassment). To recover

under Title IX based on student-on-student harassment, the Supreme Court in *Davis* held that "a

plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively

offensive, and that so undermines and detracts from the victims' educational experience, that the

victim-students are effectively denied equal access to an institution's resources and

opportunities." *Davis*, 526 U.S. at 651 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67

(1986)). Moreover, "schools can only be liable for 'deliberate indifference to known acts of peer

sexual harassment,'" meaning "that 'the [funding] recipient's response to the harassment or lack

thereof is clearly unreasonable in light of the known circumstances.'" *Raihan v. George*

*Washington Univ.*, 324 F. Supp. 3d 102, 108 (D.D.C. 2018) (quoting *Davis*, 526 U.S. at 648).

Accordingly, a plaintiff must prove five elements to recover under Title IX based on student-on-

student harassment:

> First, the defendant must be a Title IX funding recipient. Second,
> an "appropriate person" must have actual knowledge of the alleged
> discrimination or harassment. Third, the discrimination or
> harassment—of which the funding recipient had actual knowledge

under element two—must be "severe, pervasive, and objectively offensive." Fourth, the plaintiff must prove "the funding recipient act[ed] with deliberate indifference to known acts of harassment in its programs or activities." Fifth, the plaintiff must demonstrate the discrimination or harassment "effectively barred the victim's access to an educational opportunity or benefit."

*Hill*, 797 F.3d at 970 (internal citations omitted) (alterations in original) (citing *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293, 1298 (11th Cir. 2007)).

In this case, Roe attempts to hold Penn State liable under three Title IX theories: (1) a pre-assault claim, for which she seeks to hold Penn State directly liable for the alleged assault based on Penn State's deliberate indifference; (2) a post-assault claim, where she claims Penn State was deliberately indifferent when it failed to provide an adequate response to her complaint of sexual assault; and (3) an erroneous outcome claim, where she contests the outcome of the Title IX disciplinary proceeding on the basis of it being infused with gender bias.

### a.    Pre-Assault Claim

Roe's pre-assault claim attempts to hold Penn State liable for her sexual assault on the theory that it was deliberately indifferent to the two prior sexual misconduct complaints made against Doe. Penn State moves to dismiss the pre-assault allegation on the basis that Roe fails to plead: (1) an appropriate person had actual knowledge of the two prior misconduct complaints made against Doe; (2) Penn State acted deliberately indifferent to those two prior complaints of sexual misconduct; and (3) she was effectively barred equal access to an educational opportunity or benefit. Because it is clear that Roe again fails to allege a deprivation of equal access to a Penn State educational opportunity or benefit, we need not discuss Penn State's first two arguments.

To sufficiently plead an actionable Title IX violation, the plaintiff must allege that the gender-based harassment was "so severe, pervasive, and objectively offensive that it can be said

to deprive the victim[] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. In discussing this element, the Supreme Court in *Davis* noted that "[t]he most obvious example of student-on-student sexual harassment capable of triggering a damages claim would thus involve the overt, physical deprivation of access to school resources." *Id.* However, physical exclusion is not necessary to demonstrate that students have been deprived of an educational opportunity on the basis of their gender. *Id.* When physical exclusion is lacking, "courts consider whether the harassment 'had a concrete, negative effect' on the plaintiff's 'ability to receive an education.'" *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 367 (S.D.N.Y. 2017) (citations omitted). "Examples of such negative effects include a drop in grades, missing school, being forced to transfer schools, or mental health issues requiring therapy or medication." *Id.* at 368 (citations omitted).

In *Davis*, the Supreme Court also took special care to state that in the context of student-on-student harassment, private damages are limited only in cases where there is a "systemic effect of denying the victim equal access to an educational program or activity." *Davis*, 526 U.S. at 652. In fact, the Court questioned whether a single incident of harassment could ever have such an effect, noting that

> [a]lthough, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.

*Id.* at 652-53.

Penn State moves to dismiss Roe's Title IX pre-assault claim on the basis that she fails to allege a deprivation of equal access to Penn State's educational opportunities or benefits

following the assault.  (Penn State's Mem. Law Supp. Mot. Dismiss 16-17.)  In response, Roe points to the following allegations in her Amended Complaint: (1) after the alleged assault, she was forced to miss approximately one week of classes and needed to seek medical treatment, (Am. Compl. ¶ 382); the HIV medication she took made her sick, causing her not to pass a physical exam for the military which she claims set her military career back, (*id.* ¶ 314); since the alleged assault she has nightmares, feels anxiety when alone, and has trouble trusting others, (*id.* ¶ 315); she was constantly reminded of Doe while at work because she saw his name on the University Police employee list, (*id.* ¶ 316); the alleged assault negatively impacted her health, studies, relationships, and career, (*id.* ¶ 317); and she repeatedly had to answer the same questions regarding the incident during interviews with Harris, which exacerbated her mental health condition, (*id.* ¶ 321(d)).  Based on the high bar that Title IX sets for recovery, we are constrained to agree with Penn State that Roe fails to allege a systemic denial of equal access to educational opportunities or benefits.

To illustrate just how high a bar Title IX sets, we consider several cases in which courts have deemed certain allegations or evidence insufficient to constitute a denial of equal access.  In *Nungesser*, the plaintiff (a male) was accused of raping another student at Columbia University. *Nungesser*, 244 F. Supp. 3d at 351.  After a seven-month investigation and hearing on the matter, the plaintiff was found "not responsible."  *Id.*  The plaintiff pleaded that the student who accused him of rape then undertook a course of conduct to have him expelled or have him leave the university.  *Id.* at 352.  In furtherance of that alleged purpose, the student, among other things, carried her mattress around campus to raise awareness of sexual assault (which was her senior thesis and for which she received class credit); instigated others to file false accusations against the plaintiff; started spreading rumors to motivate others to join her campaign against the

plaintiff; and encouraged the president of a co-ed fraternity to notify its alumni that an alleged rapist was among their members. *See id.* at 351-52. The plaintiff filed suit against Columbia University, alleging a violation of Title IX on the basis that the university was deliberately indifferent to gender-based harassment by his accuser, which the university condoned. *Id.* at 362.

The court went to great lengths to detail the plaintiff's allegations that the above actions had a sufficient deprivation of access to educational opportunities. For instance, the plaintiff alleged that because his accuser (supported by her followers) carried around her mattress during a series of at least twenty "collective carry" events, he completely avoided being on campus unless absolutely necessary, and he alleged he was fearful to access campus resources such as the dining hall, athletic center, libraries, and center for career education. *Id.* at 358. In his complaint, the plaintiff also described what occurred on the "National Day of Action," in which several of his accuser's supporters brought mattresses and pillows to one of his classes and stared at him throughout the entire class. *Id.* at 359. Some of the supporters took his picture, and the entire event made him fearful to participate in class discussions. *Id.* He even alleged he took the class on a "pass/fail" basis to avoid having his poor performance affect his grade point average. *Id.* The plaintiff also alleged other deprivations of access to educational opportunities as a result of his accuser's actions, including: a professor telling him to drop out of a course to "make everything easier for everyone in the class"; feeling discouraged from attending a number of on-campus career events because Columbia refused to support him; missing the second half of a final exam because he suffered from sleep deprivation, depression, and feelings of isolation; and being "psychologically unable" to take the exam for his General Physics course. *See id.* at 358-60.

Despite the plaintiff's specific allegations, the court rejected the notion that any of the above assertions deprived him of equal access to Columbia's educational opportunities. *Id.* at 371. Although the court responded to each of the plaintiff's purported denials of equal access specifically, it ultimately concluded that he did not "allege that his grades dropped significantly, that he suffered mental health issues that required therapy or medication, that he was unable successfully to complete a course, that he was delayed or prevented from graduating . . . or that he missed a significant number of classes as a result of [those] events." *Id.* at 370-71. Therefore, the court found the plaintiff failed to plausibly plead a deprivation of access to educational opportunities within the meaning of Title IX. *Id.* at 371.

Similarly, in *Hawkins v. Sarasota County School Board*, the parents and guardians of three eight-year-old female students brought an action under Title IX based on sexual harassment the students suffered at school. 322 F.3d 1279, 1280-81 (11th Cir. 2003). The girls stated the harassment caused them to fake being sick on four or five occasions to avoid going to school, and their parents testified that the students cried more frequently, appeared anxious, and were reluctant to go to school. *Id.* at 1281.

In discussing whether the harassment caused a deprivation of equal access to an educational program or activity, the court stated the harassment must have a "systemic" effect of denying the victim equal access, meaning "that gender discrimination must be more widespread than a single instance of one-on-one peer harassment and that the effects of the harassment touch the whole or entirety of an educational program or activity." *Id.* at 1289 (footnote omitted). In affirming the district court's grant of summary judgment in favor of the defendant, the Eleventh Circuit held that the "record . . . reflect[ed] no concrete, negative effect on their ability to receive an education or the enjoyment of equal access to educational programs or opportunities." *Id.*

Even though the students testified they were upset about the harassment and that they faked being sick on four or five occasions to avoid going to school, the court held such evidence fell short of demonstrating a systemic effect of denying equal access to an educational opportunity or program.  *Id.*

In *Gabrielle M. v. Park Forest-Chicago Heights, Illinois School District 163*, a five-year-old female student brought a Title IX action based on sexual harassment she faced by another student at school.  315 F.3d 817, 818 (7th Cir. 2003).  Several months after the harassment started, the plaintiff's parents took her to the pediatrician because she was experiencing bedwetting, insomnia, nightmares, and loss of appetite.  *Id.* at 820.  The doctor referred the plaintiff to a counselor, who diagnosed her with acute stress disorder and separation anxiety due to the harassment she experienced at school.  *Id.*

The Seventh Circuit affirmed the district court's grant of summary judgment in favor of the defendant, concluding that even though the plaintiff was diagnosed with some psychological problems, there was no evidence the plaintiff was denied access to an education.  *Id.* at 823; *but see Davis*, 526 U.S. at 653 (concrete, negative effect on education when fifth-grade plaintiff alleged drop in grades, discovery by her father of a suicide note, and a sexual battery conviction for the harasser); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (plaintiff effectively denied education where several boys intimidated her from seventh to ninth grade, resulting in a diagnosis of depression and withdrawal from school); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248-49 (10th Cir. 1999) (plaintiff with cerebral palsy and developmentally disabled, who was sexually assaulted multiple times by another student, deprived of access to educational opportunities because she became a danger to herself, had to

leave school to enter a psychiatric hospital, and became homebound as a result of her experience at the school).

Roe's allegations in this matter fall well short of Title IX's high bar to recovery. She alleges she was required to take HIV medication following the alleged assault, which set her military career back because she failed a physical exam. However, Roe fails to provide any nexus between her military career and a Penn State educational benefit or opportunity. *See Nungesser*, 244 F. Supp. 3d at 370 (questioning whether attending on-campus career events is an educational benefit or opportunity for purposes of Title IX). She further alleges she was constantly reminded of Doe while at work because she saw his name on the employee list, but she does not allege it had any impact whatsoever on her ability to work as an auxiliary officer. Indeed, following the alleged assault, it appears Roe continued to work as an auxiliary officer uninterrupted from January 2017 until she graduated in May 2018, and she was even promoted to Lieutenant in March 2018.[3] Regarding her allegations that the alleged assault caused her to have nightmares, trouble trusting others, and anxiety when alone, and that having repeatedly to answer Harris' questions during interviews exacerbated her mental health condition, she likewise fails to allege there was any effect on her ability to access Penn State's educational opportunities or benefits. *See Gabrielle*, 315 F.3d at 823 (no denial of access even though plaintiff was diagnosed with "some psychological problems").

Roe also claims the alleged assault "negatively impacted [her] health, her studies, her relationships, and her career." (Am. Compl. ¶ 317.) This conclusory statement is insufficient to overcome a motion to dismiss. *See Nungesser*, 244 F. Supp. 3d at 369 (stating plaintiff's allegation that "his academic experience suffered" did not suffice for purposes of defendant's

---

[3] The fact that Roe did Doe's job duties between January 2017 and May 2018, without being paid the same rate as Doe, forms the basis of her Equal Pay Act claim. (Am. Compl. ¶¶ 350-54.)

motion to dismiss). But even if we were to construe liberally Roe's allegation of a negative impact on her studies to mean a decline in her grades, the Supreme Court has held "that a mere 'decline in grades'" is insufficient to survive a motion to dismiss. *Davis*, 526 U.S. at 652.

Finally, Roe alleges she was forced to miss approximately one week of classes following the alleged assault. However, she does not plead that her absence interrupted her ability to learn the course material or that it affected her grades in any way. *See Nungesser*, 244 F. Supp. 3d at 370-71 (plaintiff failed to plead deprivation of equal access because there were no allegations of significant grade decline, that he was unable to successfully complete a course or was delayed from graduating, or that he missed a significant number of classes). Moreover, the Supreme Court has held that in cases of a single incident of student-on-student sexual harassment, there must be a "*systemic* effect of denying the victim equal access to an educational program or activity." *Davis*, 526 U.S. at 652 (emphasis added). Roe's allegation of missing one week of classes falls short of a "systemic effect" of denial of equal access to Penn State's educational opportunities or benefits. *See Hawkins*, 322 F.3d at 1289 (students faking sick to avoid going to school falling "short of demonstrating a systemic effect of denying equal access to an educational opportunity or activity").

In concluding that Roe has failed to allege a denial of equal access to Penn State's educational opportunities or benefits, we by no means downplay the significant effect that sexual assault has on individuals. There can be no question that victims of sexual assault endure enormous amounts of pain. Nevertheless, we are constrained to agree with Penn State that Roe's pre-assault claim fails because she has not alleged a deprivation of equal access to an educational opportunity or benefit, which is the actionable injury within the meaning of Title IX.

Roe's Amended Complaint in this matter is extraordinarily detailed, constituting fifty-seven pages and 417 paragraphs. It is telling that following the alleged assault, she fails to detail a single instance about how she was deprived of access to Penn State's educational benefits or opportunities, such as dropping classes (or elongating her enrollment at Penn State), withdrawing from Penn State, stopping her employment as an auxiliary officer, or otherwise changing her educational activities. Roe responded to Penn State's initial motion to dismiss with the Amended Complaint, where she added the aforementioned putative allegations of deprivations of equal access. Although she requests leave to amend in the event we find her current allegations insufficient, we believe further amendment would be futile given the length and detail of the Complaint and Amended Complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). Accordingly, Roe's pre-assault claim under Title IX is dismissed with prejudice.

### b.     Post-Assault Claim

Roe also pleads a violation of Title IX based on Penn State's deliberate indifference in responding to her complaint of sexual assault, contending the length of time between her complaint and the investigation being completed was unreasonable. For Roe adequately to plead a violation of Title IX, she must meet the five elements stated above. We need not discuss all of the elements, however, because it is abundantly clear that Roe fails to plead "severe, pervasive, and objectively offensive" harassment that caused a deprivation of equal access to educational benefits or opportunities.

The District of Columbia's decision in *Raihan* provides insight regarding a post-assault claim of deliberate indifference. There, the plaintiff alleged another student engaged in sexual activity with her without her consent. *Raihan*, 324 F. Supp. 3d at 105. Two and a half years

after the incident, the plaintiff filed a formal complaint with the university.  *Id.*  An investigation and hearing ensued, which resulted in a hearing panel finding her assailant to have committed "Sexual Misconduct – (1) Sexual Violence," and recommended suspension as the appropriate sanction.  *Id.* at 106.  An official outcome letter was later sent to the plaintiff, but the sanction given to her assailant was a "deferred suspension" because the individual was graduating at the end of the semester.  *Id.* at 107.  After the university's decision, the plaintiff encountered the other student once at the school gym (where he worked), and his employment there effectively denied her access to that facility.  *Id.*

The court first found that the university's alleged deliberate indifference did not cause the plaintiff to experience "severe, pervasive, and objectively offensive" harassment.  *Id.* at 113.  The court reasoned that the plaintiff saw her assailant once at the gym and reported nothing notable about the encounter.  *Id.* at 112.  Further, in the two and a half years following the assault, the plaintiff made no allegations of harassment or limitation on her educational opportunities.  Given those facts, the court rejected the plaintiff's position that her "self-imposed exile from the University gym for a matter of weeks before her graduation" effectively denied her equal access to educational benefits or opportunities.  *Id.* at 113.

In this matter, Roe pleads absolutely no facts showing she was subjected to "severe, pervasive, and objectively offensive" harassment following her assault.  After Piotrowski filed an anonymous Title IX complaint on her behalf, the university opened an investigation within two days.  And even though the investigation took longer than expected, Roe does not allege a single incident where she was subjected to additional harassment as a result of the delay.  After the alleged assault in January 2017, Roe does not allege any encounters with Doe until the Title IX

hearing in November 2017.  In fact, Doe was not even an auxiliary police officer between January 2017 and May 2018, as he was on a leave of absence.

Lastly, unlike the plaintiff in *Raihan*, who alleged she could not access the university's gym because her attacker worked there (which the court deemed insufficient under Title IX), Roe fails to plead a single allegation about being denied equal access to Penn State's educational opportunities or benefits as a result of the lengthy investigation.  Although Roe alleges she was constantly reminded of Doe because his name remained on the University Police employee list, she fails to claim it caused any effect on her ability to be an auxiliary police officer.

Because Roe fails to plead any harassment or denial of equal access to an educational benefit or opportunity based on Penn State's alleged deliberate indifference in responding to her complaint of sexual assault, Roe's post-assault claim under Title IX fails.  Given the length and detail of her Complaint and Amended Complaint, we find any further amendment would be futile.  *See Burlington*, 114 F.3d at 1434.  Accordingly, Roe's post-assault claim is dismissed with prejudice.

### c.       Erroneous Outcome Theory

Roe's final Title IX claim is under an erroneous outcome theory, in which she claims the Title IX hearing was infused with gender bias such that it produced a flawed outcome in favor of Doe.

A plaintiff proceeding on an erroneous outcome theory is attacking the university disciplinary proceeding on the grounds of gender bias and asserts that he or she "was innocent and wrongly found to have committed the offense."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  "[T]o state a claim upon which relief can be granted under an erroneous outcome theory, a plaintiff must allege particular circumstances suggesting that gender bias was a

motivating factor behind the erroneous finding." *Doe v. The Trustees of the Univ. of Pa.*, 270 F. Supp. 3d 799, 822-23 (E.D. Pa. 2017) (internal quotation marks omitted) (quoting *Harris v. Saint Joseph's Univ.*, No. 13-3937, 2014 WL 1910242, at *4 (E.D. Pa. May 13, 2014)). "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715. "[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id.*

Penn State moves to dismiss the erroneous outcome claim on the basis that Roe merely pleads conclusory allegations of gender bias and does not allege particular circumstances necessary to establish that gender motivated Penn State's Title IX process. (Penn State's Reply Br. 2.) Roe argues that she has alleged sufficient facts to show impermissible gender bias during the Title IX hearing, such as the favorable treatment Doe was given. We agree with Penn State that Roe's erroneous outcome claim should be dismissed.

At the outset, we question whether an erroneous outcome claim is even available to a plaintiff such as Roe. Typically, cases involving an allegation that a Title IX procedure was flawed with impermissible gender bias are brought by individuals who have been accused and found responsible for committing misconduct. *See, e.g.*, *Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016); *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016); *Yusuf*, 35 F.3d at 709; *Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125 (N.D.N.Y. 2018); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018); *Powell v. Saint Joseph's Univ.*, No. 17-4438, 2018 WL 994478 (E.D. Pa. Feb. 20, 2018); *Trustees of the Univ. of Pa.*, 270 F. Supp. 3d at 799; *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177 (D.R.I. 2016);

*Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015); *Doe v. Washington & Lee Univ.*, No. 14-52, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015); *Doe v. Univ. of Mass.-Amherst*, No. 14-30143, 2015 WL 4306521 (D. Mass. July 14, 2015); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774 (S.D. Ohio 2015); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D. Ohio 2014).  The very basis of an erroneous outcome claim is that "the plaintiff contends that he is 'innocent and [was] wrongly found to have committed the offense.'"  *Trustees of the Univ. of Pa.*, 270 F. Supp. 3d at 822 (alteration in original) (quoting *Yusuf*, 35 F.3d at 715).

In this case, Roe does not claim she is innocent and wrongly found responsible for an offense.  Rather, Roe was the alleged victim of sexual assault, not the target of the Title IX disciplinary hearing.  Accordingly, her erroneous outcome claim fails as a matter of law.

Nevertheless, even if such a claim were available to Roe, we agree with Penn State that Roe has failed to plead particular circumstances necessary to show gender bias was a motivating factor during the Title IX process.  Examples of such circumstances include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Yusuf*, 35 F.3d at 715. Notably, "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss."  *Id.*

In this case, Roe merely pleads that the Title IX process was flawed and includes conclusory allegations of gender bias.  She fails to allege any statements by members of the Title IX panel, statements by other Penn State officials, or patterns of decision-making that tend to show gender discrimination.  Therefore, even assuming an erroneous outcome claim is available to Roe, her theory fails as a matter of insufficient pleading as well.

## 2.    *Section 1983 (Equal Protection Clause)*

Penn State also seeks dismissal of Roe's Section 1983 claim, under which she claims a violation of the Equal Protection Clause of the Fourteenth Amendment.  The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, and it is applicable to Penn State through 42 U.S.C. § 1983, *see, e.g.*, *Yan Yan v. Penn State Univ.*, 529 F. App'x 167, 173 (3d Cir. 2013).

To state a claim under § 1983 for a violation of the Equal Protection Clause by Penn State, Roe must meet the requirements to establish municipal liability under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).  *See S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 812 (W.D. Pa. 2016) (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009); *Hill*, 797 F.3d at 977).  To establish municipal liability, a plaintiff must prove that "'action pursuant to official municipal policy' caused the[] injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 691).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* at 61 (citations omitted).  Thus, liability cannot be established on the basis of *respondeat superior*, but rather is limited to instances where the government itself supported a violation of the plaintiff's constitutional rights.  *See S.K.*, 168 F. Supp. 3d at 813 (citations omitted).

Penn State argues that Roe's equal protection claim fails because there are no facts to indicate she was discriminated against on the basis of her gender, and that it took a gender-neutral position in addressing the allegations of sexual harassment and misconduct.  (Penn State's Mem. Law Supp. Mot. Dismiss 18.)  Roe responds by pointing out instances where she alleges she was discriminated against on the basis of her gender, such as when Doe was allowed

to submit new information during the Title IX hearing, the fact that she was not permitted to present witness testimony or cross-examine Doe, and that she spoke for only ten minutes during the hearing, whereas Doe spoke for approximately forty-five minutes. (Pl.'s Mem. Law Opp'n Penn State's Mot. Dismiss 27.)

We agree with Penn State that Roe fails to plead a claim under the Equal Protection Clause. As we noted above, Roe must establish municipal liability under *Monell* to establish an equal protection violation. *See S.K.*, 168 F. Supp. 3d at 812. To do so, she must allege that an official municipal policy caused the injury, which includes "decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

In this case, Roe has attached Penn State's Student Code of Conduct to her Amended Complaint, which details the protocols for Title IX allegations.[4] (*See* Am. Compl., Ex. A ("Code of Conduct") at 6-9.) In support of her equal protection claim, Roe argues the Code of Conduct is not sex-neutral because it "does not permit female victims to challenge any decision not to charge a male student accused of sexual misconduct." (Pl.'s Mem. Law Opp'n Penn State's Mot. Dismiss 27.) When a Title IX allegation is made, the Code of Conduct provides that "[i]f the acquired information does not reasonably support charges, then the case will be closed without charges, and both parties will be notified." (Code of Conduct at 7.) Roe's argument fails because the Code of Conduct is clearly gender-neutral. As Penn State points out, just as a female would not be able to challenge a decision not to charge a male of sexual misconduct, the plain language of the Code of Conduct would not allow a male to challenge such a decision

---

[4] Roe also relies on Penn State's "AD85 Sexual and/or Gender-Based Harassment and Misconduct (Including Sexual Harassment, Sexual Assault, Dating Violence, Domestic Violence, Stalking, and Related Inappropriate Conduct) (Formerly Discrimination, Harassment . . .)" in her Amended Complaint. (Am. Compl. ¶ 18.) Pursuant to Policy AD85, Penn State will discipline students who violate Policy AD85 in accordance with the Student Code of Conduct. (*Id.* ¶ 28.)

either.  Moreover, Roe's argument is strange because Doe *was* charged with two violations of the Code of Conduct.  To the extent Roe claims Doe was given favorable treatment during the Title IX hearing, it is clear that none of the conduct is attributable to an official policy of Penn State. *See Connick*, 563 U.S. at 60 ("[U]nder § 1983, local government's are responsible only for 'their *own* illegal acts. . . . They are not vicariously liable under § 1983 for their employees' actions."). Accordingly, Roe's claim under the Equal Protection Clause fails, and it is dismissed with prejudice.  *See Burlington*, 114 F.3d at 1434 (listing futility as a ground for denying leave to amend).

**B.      Doe's Motion to Dismiss for Lack of Subject Matter Jurisdiction**

We next address Doe's Motion to Dismiss for Lack of Subject Matter Jurisdiction, in which he claims the Court lacks supplemental jurisdiction over the state law claims of negligence or, in the alternative, assault and battery, asserted against him.[5]  For the following reasons, Doe's Motion is granted, and he is dismissed from this action without prejudice.

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  There are three requirements that must be met for a court to exercise supplemental jurisdiction: (1) "[t]he federal claim must have substance sufficient to confer subject matter jurisdiction on the court"; (2) "[t]he state and federal claims must derive from a common nucleus of operative fact"; and (3) "[b]ut if, considered without regard to their federal or state character, a plaintiff's claims are such that he

---

[5] As the Court noted above, a motion to dismiss for lack of subject matter jurisdiction can take the form of either a facial or factual attack.  Here, Doe is attacking the basis of supplemental jurisdiction on the face of the pleading, and both parties agree as well.  Accordingly, we consider only "the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Gould*, 220 F.3d at 176.

would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). "The test for a 'common nucleus of operative facts' is not self-evident." *Lyon v. Whisman*, 45 F.3d 758, 760 (3d Cir. 1995).

The parties do not dispute that we have proper federal question jurisdiction over Roe's Title VII, Title IX, Section 1983, and Equal Pay Act claims. Rather, Doe argues there is no common nucleus of operative fact between Roe's state law claims against him and any of Roe's federal claims. (Doe's Mem. Law Supp. Mot. Dismiss 8.) In particular, he argues that "[t]he only nexus between the federal claims and the state claims against Defendant John Doe is that Plaintiff and Doe were both students at Penn State and both were employed by Penn State's police department." (*Id.*) In response, Roe argues that she pleads facts in support of her state law claims against Doe that derive from the same set of facts that form the basis of her Title IX and Section 1983 claims against Penn State. (Pl.'s Mem. Law Opp'n Doe's Mot. Dismiss 14) ("Plaintiff's Title IX and Section 1983 claims against Penn State and Plaintiff's negligence (Count VIII) and assault and battery (Count IX) claims against Defendant Doe all arise from the January 28, 2017 Incident."). Indeed, Roe's Amended Complaint specifically groups the factual allegations together with a heading that states, "facts relevant to Plaintiff's Title IX, Section 1983, and all common law claims." (Am. Compl. at 37) (emphasis omitted). Thus, she effectively concedes that the state law claims against Doe supplement only the Title IX and Section 1983 claims against Penn State, and that none of the other federal claims have any relation to those state law claims.

The Court has already dismissed with prejudice Roe's Title IX and Section 1983 claims against Penn State. Therefore, because Roe admits that the remaining federal claims in the

action, Title VII and the Equal Pay Act, have no relevance to the negligence and assault/battery claims against Doe, there can be no "common nucleus of operative fact" sufficient for the Court to exercise supplemental jurisdiction. Accordingly, Doe's Motion is granted, and he is dismissed from this action without prejudice.

## IV. CONCLUSION

For the reasons noted above, Penn State and Doe's Motions are granted. Roe's claims against Penn State under Title IX and Section 1983 are dismissed with prejudice, whereas her negligence and assault/battery claims against Doe are dismissed without prejudice.

An appropriate Order follows.